552 F.2d 621
 UNITED STATES of America, Plaintiff-Appellee,
v.
Edward Grady PARTIN, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Harold SYKES, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
O. Romaine RUSSELL, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Don MARIONNEAUX and Hugh Marionneaux, Defendants-Appellants.
 Nos. 75-3615, 75-3792, 75-4010 and 75-4155.
 United States Court of Appeals, Fifth Circuit.
 May 19, 1977.
Rehearing Denied July 5, 1977.
 
 J. Minos Simon, Lafayette, La., for defendant-appellant in No. 75-3615.
 James A. McPherson (Court-appointed), New Orleans, La., for defendants-appellants in Nos. 75-3792 and 75-4155.
 Milton P. Masinter, New Orleans, La., for defendant-appellant in No. 75-4010.
 Donald E. Walter, U. S. Atty., Shreveport, La., Douglas M. Gonzales, U. S. Atty., Stephen A. Mayo, Asst. U. S. Atty., Baton Rouge, La., for plaintiff-appellee in Nos. 75-3615, 75-3792, 75-4010 and 75-4155.
 James D. Carriere, Asst. U. S. Atty., New Orleans, La., for plaintiff-appellee in Nos. 75-3615, 75-3792 and 75-4155.
 Appeals from the United States District Court for the Western District of Louisiana.
 Before MORGAN and HILL, Circuit Judges, and NOEL,* District Judge.
 LEWIS R. MORGAN, Circuit Judge:
 
 
 1
 Defendant-appellants Partin, Russell, and Sykes were convicted in three separate trials, and Don and Hugh Marionneaux in a fourth, of conspiring to obstruct the due administration of justice.[1] Because the conviction of each defendant was based on the same three count indictment, and because some of the appeals involve common issues, we consolidated the appeals for argument and decision. For the reasons stated in the opinion that follows, we must reverse the convictions of Partin. We affirm as to the other four appellants.
 
 
 2
 I. BACKGROUND AND CHRONOLOGY.
 
 
 3
 The events leading to the indictments in the instant cases began in 1969, when a federal grand jury in Baton Rouge, Louisiana indicted Edward Grady Partin, the business manager of Teamsters Local No. 5 in Baton Rouge, and others for violations of the Hobbs Act and Sherman Act.[2] Following a change of venue, Partin was tried in Butte, Montana beginning June 14, 1971. The jury was unable to reach a verdict and a mistrial was declared. After another change of venue, Partin was retried in Atlanta, Georgia beginning January 31, 1972. The jury found Partin guilty on four counts, but the district court granted a new trial. At the new trial, also in Atlanta, Partin was found guilty on one count. We reversed that conviction and remanded for a new trial. United States v. Partin, 493 F.2d 750 (5th Cir. 1974). At this point, the government elected to dismiss the indictment.
 
 
 4
 Wade McClanahan, a former Teamster ally of Partin, was the government's star witness against him in Partin's Hobbs Act trials. In February of 1970 Richard Baker and Claude Roberson testified before a federal grand jury in New Orleans that they had overheard Partin threaten McClanahan in an attempt to dissuade McClanahan from testifying against him in those trials. The New Orleans grand jury indicted Partin for obstruction of justice. Trial on this charge was set to begin October 10, 1972 in Houston.
 
 
 5
 In September of 1972 the government's key witnesses for the Houston trial, Baker and Roberson, dropped from sight. A trial subpoena was issued on September 25, 1972 for Baker to appear at the scheduled October 10 trial. Agents for the Federal Bureau of Investigation located Baker on a tugboat in West Virginia on September 27 and told him that he was expected to appear. Baker told them that he would not appear because he feared for his own and his family's lives.
 
 
 6
 The FBI agents communicated this information to the United States Attorney in New Orleans, Gerald Gallinghouse. Gallinghouse, fearing that his witnesses had been tampered with, immediately obtained a subpoena for Baker to appear before the federal grand jury in New Orleans on October 5, 1972. This subpoena, together with the trial subpoena, was served on Baker on September 30, 1972.
 
 
 7
 Baker thereupon dropped from sight once again. He did not appear before the New Orleans grand jury on October 5, and a material witness warrant was issued for him. Partin's Houston trial was continued to October 31 because of Baker's and Roberson's disappearance.
 
 
 8
 On October 31 Baker appeared at the federal courthouse in Houston and was arrested. On November 2 he testified at Partin's trial, stating that he never had heard Partin threaten McClanahan. Baker admitted that he had met with Teamster lawyer Jerry Millican and Don Marionneaux in Pittsburgh on October 3 and had given them a statement favorable to Partin. He denied that Marionneaux had given him $500 at that time, testifying instead that Marionneaux had loaned him $75. Roberson did not appear for the Houston trial at all. The jury found Partin not guilty of threatening McClanahan.
 
 
 9
 On November 9 Baker appeared under subpoena before a federal grand jury in Baton Rouge that had begun an investigation into possible obstruction of justice in connection with Partin's Houston trial. Baker repudiated his testimony at that trial, stating that he had, in fact, received $500 from Don Marionneaux in Pittsburgh. He also implicated several people in an apparent conspiracy to obstruct justice in connection with Partin's Houston trial.
 
 
 10
 On January 24, 1973 Baker again went before the Baton Rouge grand jury. He repudiated his November 9 testimony, stating (as he had at the Houston trial) that Don Marionneaux had loaned him $75, not given him $500, in Pittsburgh.
 
 
 11
 The Baton Rouge grand jury investigation continued. Baker was indicted for giving false material declarations before the grand jury, pleaded guilty on February 14, 1973, and was sentenced to prison. On October 4, 1973 the same grand jury returned the three count indictment upon which the instant cases were prosecuted. Count I charged that beginning October 1, 1972 Partin, brothers Don and Hugh Marionneaux, Jerry Thomas, Jeffrey Roy Brasseaux, Joseph Green, and Millican had conspired to obstruct the due administration of justice by inducing and helping Baker not to appear before the New Orleans grand jury on October 5 and to give false material declarations at the Houston trial.[3] Count II charged that beginning in September of 1972 Partin, Jack P. F. Gremillion, Jr., Harold Sykes, Ben Trantham, and Crockett Carleton had engaged in a similar conspiracy to obstruct the due administration of justice by inducing and helping Roberson not to appear for the Houston trial.[4] Count III charged that beginning November 9, 1972 Partin and O. Romaine Russell, a Teamster lawyer, had conspired to obstruct the due administration of justice by inducing Baker to repudiate his November 9 testimony to the Baton Rouge grand jury.[5]
 
 
 12
 A series of seven trials on this indictment began in June of 1974. From June 10 through June 14, 1974 Judge Nauman S. Scott of the Western District of Louisiana, designated by Chief Judge Brown of this court to sit ad hoc for the Middle District of Louisiana, presided over the trial of Brasseaux on Count I in Baton Rouge. A jury found Brasseaux guilty, and we affirmed the conviction. United States v. Brasseaux, 509 F.2d 157 (5th Cir. 1975).
 
 
 13
 From July 8 through July 11, 1974 Judge Scott, after granting a change of venue to Shreveport in the Western District of Louisiana, presided over the trial of Thomas on Count I. A jury found Thomas not guilty.
 
 
 14
 From August 12 through August 17, 1974 Judge Scott, after granting a change of venue to Shreveport, presided over the trial of Don and Hugh Marionneaux on Count I and Sykes, Trantham, and Carleton on Count II. A jury found the Marionneaux brothers, Sykes, and Trantham guilty and found Carleton not guilty. On appeal, we reversed the four convictions and remanded for a new trial. United States v. Marionneaux, 514 F.2d 1244 (5th Cir. 1975).
 
 
 15
 On January 20, 1975 Gremillion changed his plea to guilty on Count II. Judge Scott, finding a factual basis existed for the plea, accepted it and deferred sentencing until after the next trial.
 
 
 16
 From February 17 through March 4, 1975 Judge Scott, after granting a change of venue to Shreveport, presided over the trial of Partin on Counts I, II, and III. A jury found Partin guilty on all three counts. These convictions now are before us in No. 75-3615.
 
 
 17
 From May 26 through June 4, 1975 Judge Scott, after granting a change of venue to Alexandria in the Western District of Louisiana, presided over the trial of Russell on Count III. A jury found Russell guilty. This conviction now is before us in No. 75-4010.
 
 
 18
 From July 14 through July 18, 1975 Judge Scott presided over the retrial in Shreveport of Don and Hugh Marionneaux on Count I, together with Green, also on Count I. A jury found Don and Hugh Marionneaux guilty and found Green not guilty. These convictions of Don and Hugh Marionneaux now are before us in No. 75-4155.
 
 
 19
 From July 28 through July 30, 1975 Judge Scott presided over the retrial in Shreveport of Sykes and Trantham on Count II. A jury found both guilty. Trantham since has died, and this conviction of Sykes now is before us in No. 75-3792.
 
 
 20
 Millican, who testified for the government in all four trials on review here, has not been tried for his part in the Count I conspiracy.
 
 
 21
 II. NO. 75-3615: PARTIN.
 
 
 22
 A. The "Slight Evidence" Instruction. We are bound by precedent to reverse Partin's convictions. The district court gave the jury the following " slight evidence" instruction:
 
 
 23
 Since a conspiracy by its very nature is born and clothed in secrecy, the first element of the offense agreement is seldom susceptible of direct proof. Proof of the agreement or common purpose must therefore rest upon inferences drawn from relevant and competent circumstantial evidence ordinarily, the acts and conduct of the conspirators themselves. Once the existence of the agreement or common scheme of conspiracy is shown, however, slight evidence is all that is required to connect a particular defendant with the conspiracy.
 
 
 24
 Record Vol. 40 at 4243-44 (emphasis added). Partin's counsel objected to this instruction on the ground that it "is at war with the elementary proposition that every act of guilt must be established beyond a reasonable doubt." Id. at 4253; see also Record Vol. 9 at 1422-23 (Motion for New Trial). The objection should have been sustained.
 
 
 25
 We first considered the propriety of the "slight evidence" instruction in United States v. Brasseaux, 509 F.2d 157 (5th Cir. 1975), where we reviewed the conviction of another Count I conspirator. We held that, although the instruction's language states the appropriate standard for appellate review of the sufficiency of the evidence, but cf. United States v. Alvarez, 548 F.2d 542, 543-45 (5th Cir. 1977), it is error to give the instruction to the jury because,
 
 
 26
 (f)irst, the jury might be led to conclude that a defendant's participation in the alleged conspiracy need not be proved beyond a reasonable doubt. Second, they might simply become confused regarding the proper standard for linking a defendant to a conspiracy.
 
 
 27
 509 F.2d at 162. Because defense counsel in Brasseaux did not object to the instruction at trial, we had to determine whether, in that case, the instruction was plain error. Fed.R.Crim.Pro. 52(b). We held that, in view of counsel's failure to object and the balance of the trial court's instructions, the instruction did not constitute plain error. 509 F.2d at 161-62.[6]
 
 
 28
 We next considered the "slight evidence" instruction in United States v. Marionneaux, 514 F.2d 1244 (5th Cir. 1975), where we reviewed convictions of Count I and Count II conspirators. In Marionneaux, unlike Brasseaux, defendants did object to the instruction. We held that, "Under Brasseaux, the district court's use of the 'slight evidence' instruction over defendants' objection was reversible error," 514 F.2d at 1249, and remanded for new trials.[7]
 
 
 29
 We condemned the instruction again in United States v. Hall, 525 F.2d 1254 (5th Cir. 1976). There, where the instruction was given and duly objected to, the government argued that the error was harmless and was cured by other instructions. We refused even to entertain the argument, and reversed the conviction:
 
 
 30
 The government concedes error in the instruction but contends that the error was harmless and that the trial judge cured it by other instructions. Despite the lack of provable prejudice to defendant's case because of other instructions giving the reasonable doubt standard, however, the erroneous instruction reduced the level of proof necessary for the government to carry its burden by possibly confusing the jury about the proper standard or even convincing jury members that a defendant's participation in the conspiracy need not be proved beyond a reasonable doubt.
 
 
 31
 525 F.2d at 1256 (footnote omitted). Reduction of the government's burden of proof, we said, "is impermissibly inconsistent with the 'constitutionally rooted presumption of innocence.' See Cool v. United States, 409 U.S. 100, 93 S.Ct. 354, 34 L.Ed.2d 335 (1972) (per curiam)." 525 F.2d at 1256 n. 2. We have reiterated our strong condemnation of the instruction in dicta in two other cases. United States v. Murray, 527 F.2d 401, 409 (5th Cir. 1976); United States v. Nicholson, 525 F.2d 1233, 1237 (5th Cir. 1976).
 
 
 32
 Despite this line of cases, the government implores us to find that the instruction here, although erroneous, was harmless or was cured by other instructions. We, however, are barred from searching for harmless error or for cure by Judge Gee's opinion in Hall, supra, where he flatly refused to undertake such a search.[8] We are bound to hold, and do hold, that it was reversible error to give the "slight evidence" instruction over Partin's objection.
 
 
 33
 This error alone requires reversal. Because Partin is liable to be retried, however, we deem it proper to discuss two other questions that are likely to recur at any retrial.
 
 
 34
 B. Two Challenges to the Indictment. Partin, under the guise of challenging the sufficiency of the evidence, makes two attacks on the indictment itself. The first goes to the portion of Count I that charges he conspired with others to obstruct the due administration of justice in the Eastern District of Louisiana by inducing and helping Baker to ignore his subpoena to appear before the New Orleans grand jury on October 5, 1973. The argument, in essence, is that the New Orleans grand jury did not have jurisdiction to investigate witness-tampering because there was no evidence that any such offense had been committed in the Eastern District of Louisiana. Hence, Partin argues, a conspiracy to induce Baker not to appear at that investigation could not be one to obstruct the due administration of justice in that district.
 
 
 35
 We reject this argument because we cannot accept its premise that the New Orleans grand jury was without authority to investigate possible witness-tampering in connection with Partin's first obstruction-of-justice trial or to subpoena Baker for that purpose. The indictment in that case was brought in the Eastern District of Louisiana, and the events involved in it were centered there. United States Attorney Gallinghouse, who was handling that case, received word from FBI agents on September 27 that Baker, who had been missing for a month, had just told them in West Virginia he would not testify at that trial because he feared for his and his family's lives.
 
 
 36
 Because Baker had been out of sight for so long, at this point Gallinghouse could make only an educated guess about where and by whom (if anyone) Baker had been put in fear of his life. Because Partin's first obstruction-of-justice indictment had been brought in the Eastern District of Louisiana, and because its events had centered there, Gallinghouse decided to put the matter before the grand jury for that same district. Although hindsight teaches that in fact no obstruction of justice had occurred yet we think that, on the facts then before him, Gallinghouse acted properly both in becoming suspicious and in choosing to bring the matter before this grand jury to investigate. "(T)he court and grand jury have authority and jurisdiction to investigate the facts in order to determine whether the facts show a case within their jurisdiction." Blair v. United States, 250 U.S. 273, 282-83, 39 S.Ct. 468, 471, 63 L.Ed. 979 (1919). "Mere suspicion that a crime is being committed is sufficient reason for a grand jury to issue a subpoena. Indeed, a desire simply to assure itself that a crime is not being committed will suffice." United States v. Sahley, 526 F.2d 913, 915-16 (5th Cir. 1976). "(A grand jury) investigation may be triggered by tips, rumors, evidence offered by the prosecutor, or the personal knowledge of the grand jurors." Branzburg v. Hayes, 408 U.S. 665, 701, 92 S.Ct. 2646, 2667, 33 L.Ed.2d 626 (1972). See Also United States v. Dionisio, 410 U.S. 1, 9-13, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973). Under Partin's theory, no grand jury would have had jurisdiction to investigate possible tampering with Baker because, although Gallinghouse had evidence strongly suggesting that tampering had occurred, he had only a hunch as to where it might have occurred. We think such a conclusion would be absurd, and reject it.[9]
 
 
 37
 Partin's second attack on the indictment goes to the remaining portion of Count I and to Count III. He argues that these counts charge, at most, that he conspired to endeavor to induce Baker to commit perjury at the Houston trial and before the Baton Rouge grand jury. Relying on United States v. Essex, 407 F.2d 214 (6th Cir. 1969) for the proposition that one who commits perjury does not, by that fact alone, violate the "due administration" clause of § 1503,[10] Partin argues that one who endeavors to induce another to commit perjury does not violate that clause either. Hence, he concludes, he cannot be guilty of conspiring to do so.
 
 
 38
 Even assuming that the Essex court was correct, but see United States v. Cohn, 452 F.2d 881 (2d Cir. 1971), cert. denied, 405 U.S. 975, 92 S.Ct. 1196, 31 L.Ed.2d 249 (1972), it does not follow that one who endeavors to induce another to commit perjury does not violate the "due administration" clause. See Falk v. United States, 370 F.2d 472, 475-76 (9th Cir. 1966), cert. denied sub nom. Wendell v. United States, 387 U.S. 926, 87 S.Ct. 2044, 18 L.Ed.2d 982 (1967). It is plain that the object of the conspiracies charged was to obstruct the due administration of the Houston trial and the Baton Rouge grand jury proceeding. The means allegedly chosen inducing Baker to give false testimony may well have violated the more specific first clause of § 1503.[11] See, e. g., Smith v. United States, 234 F.2d 385 (5th Cir. 1956); Samples v. United States, 121 F.2d 263 (5th Cir.), cert. denied, 314 U.S. 662, 62 S.Ct. 129, 86 L.Ed. 530 (1941). But we do not think that would prevent the endeavor from violating the broader "due administration" clause as well; for as we have said, that clause "is broad enough to cover any act, committed corruptly, in an endeavor to impede or obstruct the due administration of justice." Samples v. United States, supra, 121 F.2d at 266. We hold that the indictment, charging violation of the due administration clause, was sufficient.
 
 
 39
 C. Mrs. Gremillion's Fifth Amendment Claim. We wish to comment briefly on Partin's claim that the district court committed reversible error in upholding Mrs. Gremillion's claim of Fifth Amendment privilege from testifying. The record developed below on this point is not very edifying on why the district court first denied the claim of privilege, or why it later upheld it. Part of the confusion can be traced, we think, to the government's eleventh hour announcement that it intended to cross-examine Mrs. Gremillion on matters that were not in the parties' contemplation when she appeared to claim the privilege and when the district court first ruled on the claim. The briefs before us do little to dispel the confusion.[12]
 
 
 40
 Because the record is unclear and because the case must be remanded anyway, we do not decide whether error was committed here. We think it best simply to note that a witness may not claim the privilege out of fear that he will be prosecuted for perjury for what he is about to say, although he may claim the privilege if his new testimony might suggest that he had perjured himself in testifying on the same subject at a prior proceeding. United States v. Wilcox, 450 F.2d 1131, 1140-41 (5th Cir. 1971), cert. denied, 405 U.S. 917, 92 S.Ct. 944, 30 L.Ed.2d 787 (1972). We also note our recent statements in United States v. Melchor Moreno, 536 F.2d 1042 (5th Cir. 1976):
 
 
 41
 A court must make a particularized inquiry, deciding, in connection with each specific area that the questioning party wishes to explore, whether or not the privilege is well-founded. (cites) As to each question, the test is whether the witness is confronted with substantial and 'real,' and not trifling or imaginary hazards of incrimination.
 
 
 42
 Id. at 1049. A witness should be excused from testifying "only if the court (finds) that (he) could 'legitimately refuse to answer essentially all relevant questions.' " Id., quoting United States v. Gomez-Rojas, 507 F.2d 1213, 1220 (5th Cir.), cert. denied, 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975). "Only as to genuinely threatening questions should (a witness's) silence (be) sustained." Id.
 
 
 43
 We deem it unnecessary to discuss Partin's other contentions of error, and hold that his convictions must be reversed.
 
 
 44
 III. NO. 75-4010: RUSSELL.
 
 
 45
 Russell, who was tried and convicted on Count III of the indictment, alleges two errors in his trial. First, he argues that the district court erred in admitting evidence relating to events involved in Counts I and II of the indictment, because he was not named as a defendant in those counts. Second, he argues that the court erred in refusing to declare a mistrial or to hold a hearing into his competency under 18 U.S.C. § 4244, after he became ill with a diabetic episode while testifying. Upon careful consideration, we reject both arguments.
 
 
 46
 A. Admission of Evidence. Russell is an attorney whose firm was on retainer from Teamsters Local No. 5. Count III charges that following Baker's November 9, 1972 testimony to the Baton Rouge grand jury, where Baker gave testimony damaging to Partin and others, Russell and Partin conspired to influence Baker to change his testimony. After Baker's appearance before the grand jury, Russell met Baker's parents at a party and told them to have Baker get in touch with him. Baker did, and in December of 1972 Russell put Baker on his law firm's payroll at $300 per month. He also loaned or gave Baker additional sums of money. Baker, Partin, and Russell met some number of times in December and January, and Partin also gave Baker some money. On January 24, 1973 Baker, with Russell as his counsel, appeared before the Baton Rouge grand jury and recanted his earlier testimony.
 
 
 47
 Before Russell's trial, prosecution and defense attorneys met with the district court to try to decide how best to give the jury background about the complicated series of events leading up to those for which Russell had been indicted. Although these meetings are not of record, we know that they produced the stipulation printed here in the margin, which was put into evidence at Russell's trial.[13] Russell's complaint is that the district court also permitted other evidence of events that occurred before November 9, 1972 the date on which the Count III conspiracy was alleged to have started to be introduced into evidence.
 
 
 48
 Russell's counsel on this appeal has not deigned to designate those portions of the record where prejudicial material supposedly was introduced.[14] Nonetheless, we have read the entire trial transcript and are convinced that no error was committed. First of all, there is absolutely no support for Russell's contention that evidence relating to Count II the count dealing with the conspiracy to hide Roberson was introduced. Instead, we find that the district court took great pains to prevent even the slightest reference to Roberson or to that conspiracy. See 2nd Supp. Record (No. 75-4010) Vol. 2 at 208, 247-48. This contention is frivolous.
 
 
 49
 Second, we find that evidence relating to other events before, during, and after Partin's Houston trial was properly admitted. Insofar as this evidence was not merely repetitious of that contained in the agreed stipulation, it was aimed primarily at explaining the circumstances of a meeting between Russell and Baker that took place in Houston on October 30, 1972, the day before Partin's trial was to begin.
 
 
 50
 Millican, a partner in Russell's law firm, had met Baker in Pittsburgh on October 3. Millican appeared before the New Orleans grand jury on October 5, and he was subpoenaed to appear before the Baton Rouge grand jury October 27 and at Partin's Houston trial October 31. Millican asked Russell to represent him for his October 27 grand jury appearance, and Russell agreed.
 
 
 51
 Russell and Millican met at the federal courthouse in Baton Rouge for that appearance, but at the last minute Millican panicked and fled. Russell, fearing Millican would not appear for Partin's trial, drove to Houston to protect his client. There he learned from Millican, who had resurfaced briefly, and from Partin's attorney, that Baker and Roberson were missing. Fearing that the absence of the prosecution's two key witnesses would have an adverse impact on Partin, Russell sent word through Teamster channels that it was essential that Baker be found.
 
 
 52
 On October 30, Don Marionneaux telephoned Russell and told him that Baker had been found. Russell went to a motel in Houston where he met Marionneaux and Baker, the latter for the first time. While there, he took two statements from Baker accusing Gallinghouse and other government officials of violating his civil rights. Russell, who made no attempt then or at his later trial to disguise his dislike for Gallinghouse, readily agreed to represent Baker at the Houston trial and in a $300,000 damage suit against Gallinghouse. After taking these statements, Russell telephoned Gallinghouse and told him Baker had been found.
 
 
 53
 We think this evidence was properly admitted. Counsel already had agreed on a stipulation relating to events surrounding the Count I conspiracy, up to October 3. See note 13, supra. This other evidence served to bridge the gap in time between that covered by the stipulation and that covered by the indictment, so that the jury would not become confused or be left to speculate about this period. The evidence also helped to put Russell and Baker's later relationship into perspective, which is a permissible purpose: "Evidence of behavior antedating the period covered by the indictment is generally admissible as bearing on the existence and purpose of the conspiracy and the significance of later behavior." United States v. Crockett, 514 F.2d 64, 72 (5th Cir. 1975); see also, e. g., United States v. Harrell, 436 F.2d 606, 612 & n. 7 (5th Cir. 1970), appeal after remand, 458 F.2d 655 (5th Cir.), cert. denied, 409 U.S. 846, 93 S.Ct. 49, 34 L.Ed.2d 86 (1972); United States v. Del Purgatorio, 411 F.2d 84, 85-86 (2d Cir. 1969).
 
 
 54
 In addition, we doubt whether the prejudicial potential of this evidence was great, for its tendency to link Russell with the Count I conspiracy was weak. This estimate is strengthened by the facts that Russell's counsel objected only sporadically to evidence from the pre-November 9 period; and that, when asked to do so, the district court conscientiously limited the prosecution's pursuit of these events. 2nd Supp.Record (No. 75-4010) Vol. 1 at 18-19, 36-37, 67-68; Vol. 2 at 225. We hold the court did not err in its handling of this evidence.
 
 
 55
 B. The Competency Issue. Before Russell's trial began, defense counsel told the district court that Russell suffered from diabetes and, as a result, sometimes became very tired. The court agreed to grant recesses when defense counsel felt it would be in Russell's interest. Record Vol. 11 at 1771-72 (order denying new trial).
 
 
 56
 The trial began on Monday, May 26, 1975. On Wednesday, May 28 Russell took the stand to testify in his defense. His testimony on direct examination that day covers 60 pages of transcript. 2nd Supp. Record (No. 75-4010) Vol. 3 at 390-450. His testimony that day ended when defense counsel, believing that his client was becoming ill, asked for and was granted a recess. Id. at 450.
 
 
 57
 The district court immediately ordered that Russell be examined by Dr. Lloyd M. Godley in order to determine the seriousness of his condition. Dr. Godley examined Russell on May 28 and again on May 29. He determined and reported to the court that Russell was suffering elevated blood sugar, a sign that his diabetes condition was not under control. Record Vol. 10 at 1528 (letter dated May 29, 1975). He suggested that Russell be treated by a physician for this condition. Id.
 
 
 58
 On the afternoon of Thursday, May 29 Russell, prosecution and defense counsel, and the court met to decide the best course of action. Russell spoke on his own behalf, asking that he be released to the care of his own doctor. 2nd Supp. Record (No. 75-4010) Vol. 3 at 455-56. After some discussion, id. at 454-63, the court decided to continue the trial, release the jury from its sequestration, and order Russell to the Federal Medical Center in Springfield, Missouri for treatment. At this meeting defense counsel expressed concern about releasing the jury, id. at 459-62, but neither he nor Russell raised an issue as to Russell's competency on the day he became ill.
 
 
 59
 On Friday, May 30 a federal marshal accompanied Russell on the airplane trip to Springfield. Doctors there treated Russell over the weekend, changing the dosage of his diabetes medicine, and released him on Tuesday, June 3. Record Vol. 10 at 1530 (letter dated June 3, 1975).
 
 
 60
 Russell was flown back to Alexandria the morning of Wednesday, June 4. Before he arrived, the court met with prosecution and defense counsel to update them on developments in Russell's condition. At this meeting, defense counsel, for the first time, raised the possibility that Russell had not been competent on the stand Thursday because of his elevated blood sugar, although he admitted that, "I don't have anything to back it up." 2nd Supp. Record (No. 75-4010) Vol. 4 at 470; see also id. at 472. The district court, noting that Russell's demeanor on the stand the previous Wednesday had not appeared to change during his testimony, id. at 471-72, and that Russell had appeared to be "totally in control of himself" the following day when he had pleaded not to be sent to Springfield, id. at 467, denied a motion for mistrial on this ground. Shortly thereafter Russell arrived, took the stand, and resumed his testimony. Id. at 479.
 
 
 61
 Defense counsel raised the competency issue again on motion for new trial. Alleging that "while defendant was testifying on direct examination in his own defense, the defendant was obviously confused," Record Vol. 11 at 1740 (memorandum in support of motion for new trial), he requested, for the first time, a hearing on whether defendant had been competent during his first day of testimony. The district court denied the motion in a written order without holding the requested hearing. Relying on its own recollection and on an examination of the transcript of Russell's testimony, the court found that "throughout the trial (Russell) was fully capable, mentally and physically, of aiding and advising his counsel and of testifying whenever he was called upon to do so," Record Vol. 11 at 1772, and that "his testimony as a witness was coherent, logical, deliberate and responsive and is ample evidence that he was mentally and physically able and competent to testify at all times that he was called upon to do so," id. at 1774.
 
 
 62
 It is well settled that, "the ordering of (a § 4244) examination requires an exercise of judicial discretion to determine if there is 'reasonable cause to believe' that the defendant may be incompetent." United States v. Hall, 523 F.2d 665, 667 (2d Cir. 1975); Accord, e. g., Reed v. United States, 529 F.2d 1239, 1241 (5th Cir. 1976); United States v. Curtis, 520 F.2d 1300, 1304 (1st Cir. 1975); Rice v. United States, 420 F.2d 863, 866 (5th Cir. 1969), cert. denied, 398 U.S. 910, 90 S.Ct. 1705, 26 L.Ed.2d 70 (1970).[15] It is equally clear that the district court, in making this determination, may rely on its "opportunity to observe (the defendant's) demeanor and the quality of his responses." Reed v. United States, supra, 529 F.2d at 1241; see United States v. Curtis, supra, 520 F.2d at 1304; United States v. Jones,, 415 F.2d 753, 754 (5th Cir.), cert. denied, 396 U.S. 948, 90 S.Ct. 390, 24 L.Ed.2d 251 (1969); cf. United States v. Makris, 535 F.2d 899, 902 (5th Cir. 1976).
 
 
 63
 The only indication in the instant record that Russell might not have been competent some time before he left the stand on the first day of his testimony is contained in Dr. Godley's letter of May 29 to the court. That letter states that Russell's "subjective story was that . . . he had come near collapse in the courtroom with a deviation from rationality in speech and manner . . ." Record Vol. 10 at 1528. This self-serving account plainly is at odds with the district court's first hand observations, as set forth in its order denying a new trial. In addition, we have examined the transcript of Russell's testimony that day and agree with the district court's characterization of it as "coherent, logical, deliberate and responsive." We hold that, on the facts of this case, the district court did not abuse its discretion in concluding there was not reasonable cause to order a § 4244 examination or hearing. We therefore affirm Russell's conviction.
 
 
 64
 IV. NO. 75-4155: DON MARIONNEAUX AND HUGH MARIONNEAUX.
 
 
 65
 Don and Hugh Marionneaux, who were tried and convicted on Count I of the indictment, allege seven errors in their trial. We find the allegations to be without merit, and affirm.
 
 
 66
 A. Refusal of Judge Scott to Recuse Himself. As we noted in Part I, Judge Scott presided over the seven separate trials on the indictment in this case, including the instant retrial of Don and Hugh Marionneaux after we reversed and remanded their convictions in United States v. Marionneaux, 514 F.2d 1244 (5th Cir. 1975). Before retrial, defense counsel filed what was styled a "motion to withdraw" and memorandum in support thereof in the district court, requesting that Judge Scott recuse himself on the retrial. Record Vol. 11 at 1621-23. The judge denied the motion in a written order, id. at 1640-41. In this court, the defense filed a motion to stay the trial and for mandamus to the district court, which we denied. In re Marionneaux, No. 75-2826 (July 10, 1975), copy at Record Vol. 11 at 1643.
 
 
 67
 The recusal motion did not rely on 28 U.S.C. § 144 or 28 U.S.C. § 455, nor was it accompanied by the affidavit required by the former section.[16] Neither did it allege or intimate in any way that Judge Scott harbored any personal bias against the defendants or that he had prejudged their case. Rather, the motion relied on certain statements by the Second Circuit in United States v. Bryan, 393 F.2d 90 (2d Cir. 1968) (which sometimes is cited as United States v. Simon) regarding the propriety of the same judge presiding over the retrial of defendants whose first trial ended in a hung jury. In their instant appeal, defendants also intimate that it is improper for the same judge to preside over the separate trials of alleged co-conspirators, or for a judge who has accepted a guilty plea from one co-defendant to preside over the trial of another co-defendant.[17] We, however, reject the argument that any of these factors, or all of them together, required Judge Scott to grant the motion to recuse.[18]
 
 
 68
 This court previously has said that it sees nothing wrong, per se, with the same judge presiding over a retrial after reversal. In Smith v. United States, 360 F.2d 590 (5th Cir. 1966) the district court, in a bench trial, found the defendant guilty. The court then read a pre-sentence report on defendant. Thereafter the court, on defendant's motion, reopened the proof and, after hearing further evidence, again found defendant guilty.
 
 
 69
 On appeal, defendant, relying on Fed.R.Crim.Pro. 32(c)(1),[19] argued that the district court should have declared a mistrial because he had read the pre-sentence report before he reopened proof and found defendant guilty again. We rejected the argument in these words:
 
 
 70
 The receipt by a trial judge of a presentence investigation report, in a manner not prohibited by Rule 32(c)(1), does not disqualify him from hearing evidence on a reopening of a trial. To suggest otherwise would suggest also that he thereby renders himself incompetent to hear a retrial of the same case, should he be reversed on appeal . . . That would be highly untenable . . .
 
 
 71
 360 F.2d at 592 (emphasis added). We since have expressed similar views in United States v. Harris, 458 F.2d 670, 678 (5th Cir.), cert. denied sub nom. Scott v. United States, 409 U.S. 888, 93 S.Ct. 195, 34 L.Ed.2d 145 (1972)[20] and United States v. Hernandez-Vela, 533 F.2d 211, 213-14 (5th Cir. 1976).[21] See also Jones v. Caddo Parish School Board, 499 F.2d 914, 918 (5th Cir. 1974). And no lesser light than Mr. Justice Frankfurter, writing for the Supreme Court, has expressed the same view:Certainly it is not the rule of judicial administration, that, statutory requirements apart, (citing the predecessor of 28 U.S.C. § 144), a judge is disqualified from sitting in a retrial because he was reversed on earlier rulings.
 
 
 72
 NLRB v. Donnelly Garment Co., 330 U.S. 219, 236, 67 S.Ct. 756, 765, 91 L.Ed. 854 (1947); see also United States v. Crovedi, 467 F.2d 1032, 1038 (7th Cir. 1972), cert. denied, 410 U.S. 990, 93 S.Ct. 1510, 36 L.Ed.2d 189 (1973) and sub nom. Bratko v. United States, 410 U.S. 982, 93 S.Ct. 1510, 36 L.Ed.2d 178 (1973).
 
 
 73
 It is against this line of precedent that we weigh the Second Circuit's per curiam opinion in Bryan, upon which appellants rely so heavily, and that case's progeny. In Bryan, a district court judge in the Southern District of New York was assigned to preside at the retrial of criminal defendants after he had presided at a mistrial in the same case, despite the long-standing practice in that district of having "the second trial of a criminal case of any length and complexity tried before a judge other than the judge who presided at the first trial." 393 F.2d at 90. The judge denied a motion by the government that he recuse himself. On the government's petition for mandamus, the Second Circuit strongly urged the judge to reconsider his denial, stating, id. at 91:
 
 
 74
 We believe that at least in a multi-judge district such as the Southern District of New York where the necessity of retrial before the same judge is not present, the practice of retrial before a different judge is salutary and in the public interest, especially as it minimizes even a suspicion of partiality. Because we believe that this outweighs any considerations of judicial economy and convenience, we hold that it is the wiser practice, wherever possible, that a lengthy criminal case be retried before a different judge unless all parties request that the same judge retry the case.
 
 
 75
 Almost as soon as it announced this "rule," the court of appeals began to undermine its rationale and to limit its application. In Wolfson v. Palmieri, 396 F.2d 121 (2d Cir. 1968) the court denied a petition for mandamus to direct a district court judge not to try criminal defendants whom he previously had tried on different charges. The court quoted United States v. Grinnell Corp., 384 U.S. 563, 583, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966) for the proposition that, "The alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." 396 F.2d at 124. Then, stating that "(i)t is no answer to refer to the large number of trial judges in the Southern District (of New York)," id. at 125, and that "(i)n the absence of proof, there should be at least a presumption that the trial court will conduct an errorless trial," id. at 126, the court limited Bryan to its facts, id.:
 
 
 76
 Much reliance is placed by petitioner on (Bryan ), which involved the retrial of the same case by the same judge. That decision, as all these decisions must be, was based upon the particular facts there presented. To extend the rule there announced to the trial of different charges against the same defendants would take this Court too far into problems necessarily left to the good judgment of the district judges.
 
 
 77
 The process of limiting Bryan continued apace in United States v. Di Lorenzo, 429 F.2d 216 (2d Cir. 1970), cert. denied, 402 U.S. 950, 91 S.Ct. 1609, 29 L.Ed.2d 120 (1971), where the court of appeals refused to read Bryan as requiring that different judges preside at the separate trials of alleged co-conspirators. Noting that it had declined to extend Bryan in Wolfson, the court went so far as to state that, "(a)bsent special considerations, judicial economy and calendaring demands often make it desirable that the same judge preside at seriatim trials of co-conspirators." 429 F.2d at 221. We think it is significant that two of the same judges who sat on Bryan also sat on Di Lorenzo, and that they appear to have had second thoughts about the balance of considerations in cases of this kind.
 
 
 78
 The process of erosion reached its culmination in United States v. Newman, 481 F.2d 222 (2d Cir.), cert. denied, 414 U.S. 1007, 94 S.Ct. 367, 38 L.Ed.2d 244 (1973), where the court of appeals held that it was not error for a district court judge to retry a criminal case after the first trial ended in a hung jury, despite the Bryan "rule":
 
 
 79
 (T)he court in Bryan was speaking of reassignment as the 'wiser practice' in retrials of 'lengthy criminal cases,' . . . not setting down a requirement in every case. See also Wolfson v. Palmieri, 396 F.2d 121, 126 (2d Cir. 1968) (per curiam) (Bryan . . . limited to 'particular facts' there presented).
 
 
 80
 481 F.2d at 223. The court followed Newman, not Bryan in similar circumstances in United States v. Edmonds, 535 F.2d 714, 717 (2d Cir. 1976).
 
 
 81
 Far from supporting appellants' position, this line of Second Circuit cases after Bryan reaffirms our conviction that we ought not lightly announce a per se rule that a district court judge should not retry a case after mistrial or reversal. The cases demonstrate, we think, that such a rule is not the sine qua non for either the substance or the appearance of justice. Those causes are served admirably when the district court judge who retries the case conscientiously attempts to conduct a trial that is fair to both the defendant and the government, as is his duty. Furthermore, a per se rule inevitably would create serious calendaring problems and might well increase delays in going to trial, especially in this circuit's smaller districts. Altogether, we see little to commend such a rule, and we decline to hold that it is required by law. See United States v. Hernandez-Vela, supra; United States v. Harris, supra; Smith v. United States, supra.[22]
 
 
 82
 For the same reasons, we decline to hold that a trial judge is disqualified because he presided over the separate trial of a co-defendant, United States v. Di Lorenzo, supra, 429 F.2d at 220-21; see United States v. Jeffers, 532 F.2d 1101, 1111-12 (7th Cir. 1976), or because he accepted the guilty plea of a co-defendant, United States v. Bernstein, 533 F.2d 775, 784-85 (2d Cir. 1976); United States v. Myers, 381 F.2d 814, 817 (3d Cir. 1967), cert. denied sub nom. Bennett v. Myers, 390 U.S. 973, 88 S.Ct. 1065, 19 L.Ed.2d 1185 (1968). In the instant case, appellants do not allege and the record does not show that Judge Scott harbored a personal bias that would disqualify him. See United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). In the absence of such allegations and showing, we hold it was not error for him to deny the motion to recuse.
 
 
 83
 B. Denial of Change of Venue. Appellants were retried in July of 1975 in Shreveport, which also had been the site, after a change of venue, of their first trial in August of 1974, of Thomas' trial in July of 1974, and of Partin's trial in February and early March of 1975. Before the retrial, they moved for a change of venue to Lake Charles, Opelousa, or New Orleans under Fed.R.Crim.Pro. 21(a),[23] alleging that publicity in the Shreveport area from the previous trials had created an atmosphere in which they could not receive a fair trial. Record Vol. 11 at 1616-19. They now complain that the district court committed reversible error in denying the motion.
 
 
 84
 We do not agree. The transcript of the district court's scrupulous voir dire of the jury panel, 2nd Supp. Record (No. 75-4155),[24] reveals that of fifty panel members, only eleven thought they remembered having seen or heard anything about the previous or pending trials. Id. at 32-33, 57, 63, 71. The district court questioned each of these panel members out of the presence of other panel members to determine whether they could serve impartially, and one was excused by the court for cause. Id. at 82. The responses of the others indicate only the slightest familiarity with the previous or pending cases, and no prejudice.
 
 
 85
 It is axiomatic that a Rule 21(a) motion is addressed to the sound discretion of the district court. E. g., Ehrlichman v. Sirica, 419 U.S. 1310, 1312, 95 S.Ct. 6, 42 L.Ed.2d 25 (1974) (Burger, C. J., Circuit Justice); United States v. Williams, 523 F.2d 1203, 1209-10 (5th Cir. 1975); United States v. Thaggard, 477 F.2d 626, 630 (5th Cir.), cert. denied, 414 U.S. 1064, 94 S.Ct. 570, 38 L.Ed.2d 469 (1973); United States v. Nix, 465 F.2d 90, 95-96 (5th Cir.), cert. denied, 409 U.S. 1013, 93 S.Ct. 455, 34 L.Ed.2d 307 (1972). A careful voir dire is invaluable in gauging whether community prejudice is so great that a defendant cannot receive a fair trial in a given locale. See, e. g., Murphy v. Florida, 421 U.S. 794, 799-803, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); United States v. Williams, supra, 523 F.2d at 1209 n.10; Calley v. Callaway, 519 F.2d 184, 208-09 & ns. 42-45 (5th Cir. 1975) (en banc), cert. denied, 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976). Our "independent evaluation of the facts," United States v. Williams, supra, 523 F.2d at 1208, and in particular of the responses on voir dire, convinces us that the district court acted well within its permissible range of discretion in concluding that appellants could receive a fair trial in Shreveport. See Murphy v. Florida, supra, 421 U.S. at 799-803, 95 S.Ct. 2031; United States v. Nix, supra, 465 F.2d at 95-96.
 
 
 86
 C. Joinder of Hugh Marionneaux and Joe Green with Don Marionneaux. The district court denied a motion under Fed.R.Crim.Pro. 14[25] to sever Hugh Marionneaux and his father-in-law Joseph Green from Hugh's brother Don for trial. Hugh Marionneaux now complains this was error. It is firmly established that a motion to sever alleged coconspirators is committed to the sound discretion of the district court, under the test we set forth in Tillman v. United States, 406 F.2d 930, 935 (5th Cir. 1969), citing Peterson v. United States, 344 F.2d 419, 422 (5th Cir. 1965):
 
 
 87
 (C)an the jury keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him? If so, though the task be difficult, severance should not be granted.
 
 
 88
 We will overturn the district court's ruling only upon a showing by the defendant that actual prejudice resulted from denial of severance. United States v. Dearden, 546 F.2d 622, 625 (5th Cir. 1977); United States v. Morrow, 537 F.2d 120, 134 (5th Cir. 1976).
 
 
 89
 Hugh Marionneaux does not point to evidence that was introduced against his brother Don but was not admissible against him, so we do not have here the "troublesome problem of limiting the jury's consideration of testimony admissible against some defendants but not others." United States v. Davis, 546 F.2d 617, 620 (5th Cir. 1977). Nor does he complain that a co-defendant's exculpatory testimony was unavailable, see United States v. Morrow, supra, 537 F.2d at 134-35, or that he and Don had antagonistic defenses, see United States v. Larson, 526 F.2d 256, 260 (5th Cir. 1976). Instead, he argues that the case against him was weaker than against his brother, and that the jury might have attributed greater knowledge to him of his brother's actions than in fact was the case, simply because they were brothers.
 
 
 90
 This argument is untenable. "A defendant cannot claim prejudice from failure to sever merely because his likelihood of acquittal is not as great in a joint trial as in a separate trial." United States v. Larson, supra, 526 F.2d at 260. The district court carefully instructed the jury that it must give separate consideration to the case of each defendant. 1st Supp. Record (No. 4155) Vol. 4 at 931; see United States v. Larson, supra, 526 F.2d at 260. That the jury followed its instructions is demonstrated by the fact that it found Joseph Green not guilty. We hold that the district court did not abuse its discretion in denying the motion to sever.
 
 
 91
 D. Voir Dire. Defense counsel complains that "the trial court committed reversible error when it refused to interrogate prospective jurors, at defense counsel's request, with respect to their and their spouses' employment, education, etc." Brief for Appellees at 35. The record reveals that, in fact, the district court asked each of the fifty panel members "to rise and state your name, state your marital status, state your occupation or your job and your education, the furthest you went in education. And if you are a lady please also state the name of your husband and his occupation or his job." 2nd Supp. Record (No. 75-4155) at 7. Each panel member did so. Id. at 7-25. This assignment of error therefore is patently frivolous, and it evidences a disturbing inattention to counsel's duty to represent the facts to this court accurately.
 
 
 92
 E. Jury Instructions: "Corruptly." The district court instructed the jury as follows:
 
 
 93
 The substantive offense alleged in the indictment is a violation of 18 U.S.C. 1503, which reads as follows: Whoever corruptly, or by threats or force, endeavors to influence, intimidate, or impede any witness, in any court of the United States or corruptly or by threats or force, influences, obstructs, or impedes the due administration of justice, violates the laws of the United States.
 
 
 94
 The word corruptly means a defendant acted with improper motive or with bad or evil or wicked purpose. Any endeavor to influence or intimidate or impede a witness falls within the meaning of the word corruptly.
 
 
 95
 While proceedings are pending any threat or other corrupt endeavor to influence a participant is an offense. And such endeavor need not be successful to be punishable as an offense against the United States.
 
 
 96
 The administration of justice it should be pointed out means the performance of acts required by law in the discharge of duties such as appearing as a witness and giving truthful testimony when subpoenaed. The statue (sic) herein describing corrupt endeavor to influence and obstruct or impede the due administration of justice was enacted for the purpose of safeguarding the administration of justice.
 
 
 97
 1st Supp. Record (No. 75-4155) Vol. 4 at 923-24. Although "defendants did not expressly object to the Court's charge defining 'corruptly,' " Brief for Appellants at 43, they did request an additional instruction "that it is not against the law to obstruct an injustice." 1st Supp. Record (No. 75-4155) Vol. 4 at 940. The district court denied the request, and appellants urge this was reversible error.
 
 
 98
 Appellants' theory, which they did not articulate to the district court, is that the second paragraph of the instructions quoted above would permit the jury to convict even if a defendant had endeavored merely to "influence" a witness to testify truthfully. This is so, they argue, because the second sentence of that paragraph states that "any endeavor to influence . . . a witness falls within the meaning of the word corruptly."
 
 
 99
 Because appellants did not object to the portion of the charge defining "corruptly," because their own proposed instruction "that it is not against the law to obstruct an injustice" was much broader than necessary to correct the infirmity they urge here, and because they did not articulate their theory here to the court below, the objection below was not sufficient to put the district court on notice as to the problem they complain of now. For this reason, we test the instruction given against the plain error standard, see Fed.R.Crim.Pro. 30, 52(b), and conclude that even if the charge was less than happily phrased, it did not amount to plain error.
 
 
 100
 The second paragraph begins by stating, correctly, that the word " corruptly" in § 1503 "means a defendant acted with improper motive or with bad or evil or wicked purpose." United States v. Ryan, 455 F.2d 728, 734 (9th Cir. 1971); See United States v. Abrams, 427 F.2d 86, 90 (2d Cir.), cert. denied, 400 U.S. 832, 91 S.Ct. 64, 27 L.Ed.2d 63 (1970) (construing 18 U.S.C. § 1505). This instruction, standing alone, is sufficient to inform a jury that § 1503 does not encompass an attempt to influence a witness to testify truthfully. United States v. Abrams, supra.
 
 
 101
 The next sentence, stating that "any endeavor to influence or intimidate or impede a witness falls within the meaning of the word corruptly," plainly is not intended to expand this definition of "corruptly" to encompass an endeavor to influence a witness to tell the truth.[26] Instead, it is meant to remind the jury as the first paragraph quoted above states explicitly that an endeavor either to influence or to intimidate or to impede a witness may be undertaken "corruptly," that is, with "improper motive or with bad or evil or wicked purpose;" and that if it is, it violates § 1503. Read in its context, we think it is very unlikely that this sentence would lead the jury to believe that "influencing" a witness to testify truthfully was punishable under § 1503.[27]
 
 
 102
 This assessment is strengthened by the presence of the third paragraph quoted above, which states, as does the first paragraph, that it is a "corrupt endeavor to influence" a witness that is an offense. And the last paragraph quoted above, defining the "administration of justice" as the "performance of acts required by law in the discharge of duties such as appearing as a witness and giving truthful testimony when subpoenaed," would itself preclude conviction for endeavoring to influence a witness to tell the truth; for it plainly implies that only an endeavor to influence a witness not to tell the truth is an endeavor to influence the "administration of justice." Thus, although we agree with appellants that the second sentence of the second paragraph quoted above might have been better phrased, we hold it was not plain error to give it.[28]
 
 
 103
 F. Jury Instructions: "Nothing Particularly Different." Near the end of its charge, the district court instructed the jury as follows:
 
 
 104
 There is nothing particularly different in the way a jury should consider the evidence in a criminal case from that in which all reasonable persons treat any question depending upon evidence presented to them. You are expected to use your good sense, consider the evidence in the case for only those purposes for which it has been admitted and give it a reasonable and fair construction in the light of your common knowledge of the natural tendencies and inclinations of human beings. If the defendant be proved guilty beyond a reasonable doubt, say so. If not so proved guilty, say so.
 
 
 105
 1st Supp. Record (No. 75-4155) Vol. 4 at 932. Appellants did not object to this instruction at trial, but they now urge that it was plain error to instruct in the terms of the first sentence quoted above because the "nothing particularly different" language tends to dilute the requirement that guilt be proven beyond a reasonable doubt.
 
 
 106
 It is true that this language, which appears to have been adapted from 1 Devitt & Blackmar, Federal Jury Practice and Instructions § 17.06 (2nd Ed. 1970), see also 1 Devitt & Blackmar, Federal Jury Practice and Instructions § 15.01 (3rd Ed. 1977), has been criticized on this ground. See United States v. Pepe, 501 F.2d 1142, 1143-44 (10th Cir. 1974); United States v. Downen, 496 F.2d 314, 321-22 (10th Cir.), cert. denied, 419 U.S. 897, 95 S.Ct. 177, 42 L.Ed.2d 142 (1974); United States v. Cummings, 468 F.2d 274, 280-81 (9th Cir. 1972); Tarvestad v. United States, 418 F.2d 1043, 1048-49 (8th Cir. 1969), cert. denied, 397 U.S. 935, 90 S.Ct. 944, 25 L.Ed.2d 116 (1970). It is also true, however, that even where defendants have objected to it, the language has been held not prejudicial in view of repeated references to the reasonable doubt standard elsewhere in the instructions. United States v. Pepe, supra; United States v. Downen, supra; United States v. Cummings, supra; Tarvestad v. United States, supra.
 
 
 107
 In the instant case, the district court gave a complete and correct reasonable doubt instruction, 1st Supp. Record (No. 75-4155) Vol. 4 at 907-08, and the court referred to the reasonable doubt standard many additional times throughout the instructions, id. at 909, 914, 915, 917, 922, 925, 926, 927, 928, 929, 930, 932. In fact, the final sentence of the paragraph complained of and quoted here repeats the reasonable doubt requirement. In these circumstances, although "we do not believe the instruction provides any particular assistance to the jury in the performance of its tasks," United States v. Pepe, supra, 501 F.2d at 1144, we hold that use of the language complained of was not plain error. See cases cited supra.
 
 
 108
 G. Jury Instructions: Witness Security Program. On direct examination by the government Millican testified that he had entered the federal witness security program in April of 1973. He stated that under the program, administered by the Department of Justice, he had been given a new name and social security number. He also stated that under the program, he and his family received $1080 per month subsistence from the government.[29] When the government asked who he was hiding from, Millican answered, without objection, that he was hiding from Partin. 1st Supp. Record (No. 75-4155) Vol. 3 at 582. The defense did not cross-examine Millican.
 
 
 109
 The district court gave the following instruction to the jury:
 
 
 110
 All evidence of a witness whose self-interest is shown from either benefits received, whether they be received in money, in protective custody afforded by the Government or any other benefit, or any detriments suffered, threats or promises made, or any attitude of the witness which might tend to prompt testimony either favorable or unfavorable to the accused should be considered with caution and weighed with care.
 
 
 111
 The Attorney General of the United States is authorized by law to provide for the security of Government witnesses, potential Government witnesses, and the families of Government witnesses and potential witnesses. The Attorney General is likewise authorized by law to provide for the health, safety and welfare of witnesses and their families. This may include the payment of money, providing a new identity and securing a job to minimize physical and economic harm to the witnesses and their families.
 
 
 112
 1st Supp. Record (No. 75-4155) Vol. 4 at 912. Although the defense did not object to this instruction, it did request an additional instruction to the effect that the second paragraph of the instruction quoted above did not imply "the Court's acceptance or rejection of Millican's expressed fear" of appellants' alleged co-conspirator, Partin. Id. at 939. The court denied the request on the ground that the instruction given "makes it clear that the Attorney General of the United States is authorized" to provide security for witnesses, id. (emphasis added), evidently being of the opinion that the instruction carried no implication that the court itself believed Millican's fear had a basis in fact. Appellants assign this denial as reversible error.
 
 
 113
 Disclosure of the fact that a government witness is participating in the witness security program, authorized by the Organized Crime Control Act of 1970, Pub.L. No. 91-452, tit. V, 84 Stat. 933,[30] is a matter that must be handled delicately. The defense has a right to show that a witness, while in the program, has received substantial benefits, see United States v. Librach, 536 F.2d 1228, 1231 (8th Cir. 1976); United States v. Librach, 520 F.2d 550, 552-554 (8th Cir. 1975); United States v. Muckenstrum, 515 F.2d 568, 569-70 (5th Cir.), cert. denied, 423 U.S. 1032, 96 S.Ct. 564, 46 L.Ed.2d 406 (1975); United States v. Howell, 514 F.2d 710, 715 (5th Cir.), cert. denied sub nom. Harris v. United States, 423 U.S. 914, 96 S.Ct. 220, 46 L.Ed.2d 143 (1975) and Allen v. United States, 423 U.S. 987, 96 S.Ct. 396, 46 L.Ed.2d 304 (1975); United States v. Partin, 493 F.2d 750, 757-60 (5th Cir. 1974). At the same time, however, there often is a danger that the jury will infer, even without further evidence, that the defendant himself was the source of the threat that moved the Justice Department to approve the witness's participation in the program. See United States v. Librach, supra, 536 F.2d at 1231-32 & n. 6; United States v. Librach, supra, 520 F.2d at 554 n. 4. Although that risk may be to some extent unavoidable, the prosecution should not be allowed to exploit it. Cf. United States v. Librach, supra, 536 F.2d at 1231-32 & n. 6.
 
 
 114
 In the instant case, it was the government, not the defense, that brought out Millican's participation in the program and his fear of Partin. It did so without objection, and it made no attempt to exploit these facts during closing argument. The defense, on the other hand, attacked Millican's credibility during closing argument by referring to the fact that he had received substantial amounts of money from the government. See 1st Supp. Record (No. 75-4155) Vol. 4 at 874.
 
 
 115
 The instruction that the district court gave was calculated to erase any implication that the benefits Millican received from the government were bestowed improperly. We agree with the district court that the instruction did not imply that the court itself believed or disbelieved Millican.[31] Hence, we hold that the additional instruction was properly refused.
 
 
 116
 Any injury to appellants from disclosure of Millican's participation in the witness security program occurred when the government brought this evidence out in the first place, not when the jury was instructed. Although appellants have not argued that it was error to permit the government to pursue these questions during direct examination of Millican, we nonetheless have considered the possibility. The defense did not object to the questions, and because the government did not further exploit the facts elicited, we have concluded that it was not plain error to allow these questions. We therefore affirm the convictions of Don and Hugh Marionneaux.
 
 
 117
 V. NO. 75-3792: SYKES.
 
 
 118
 Sykes, who was convicted on Count II at his retrial in Shreveport, raises three of the same issues raised in No. 75-4155. For the reasons stated in Part IV.A. supra, we hold that Judge Scott did not err in denying Sykes' recusal motion. We have examined the jury instructions in Sykes' case and find that the jury was correctly and repeatedly instructed on reasonable doubt in a manner substantially identical to that used in No. 75-4155. We therefore hold, for the reasons stated in Part IV.F. supra, that the "nothing peculiarly difficult" instruction did not constitute plain error. Finally, we have examined the voir dire of prospective jurors, in which only seven of 52 panel members indicated any familiarity with the case, 2nd Supp. Record (No. 75-3792), and hold, for the reasons stated in Part IV.B. supra, that the district court did not err in denying a change of venue. We therefore affirm Sykes' conviction.
 
 
 
 *
 Senior District Judge of the Southern District of Texas, sitting by designation
 
 
 [1]
 18 U.S.C. § 1503 provides:
 Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness, in any court of the United States or before any United States magistrate or other committing magistrate, or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate or other committing magistrate, in the discharge of his duty, or injures any party or witness in his person or property on account of his attending or having attended such court or examination before such officer, commissioner, or other committing magistrate, or on account of his testifying or having testified to any matter pending therein, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, magistrate, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.
 18 U.S.C. § 371 provides:
 If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof, in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.
 
 
 [2]
 As to the others involved, see United States v. Dunham Concrete Products, Inc., 475 F.2d 1241 (5th Cir.), cert. denied, 414 U.S. 832, 94 S.Ct. 65, 38 L.Ed.2d 66 (1973)
 
 
 [3]
 Count I charged, Record Vol. 1 at 1-2:
 Beginning October 1, 1972, and continuing until November 3, 1972, in the Middle District of Louisiana, defendants EDWARD G. PARTIN, HUGH MARIONNEAUX, DON MARIONNEAUX, JERRY THOMAS, JEFFREY ROY BRASSEAUX, JOSEPH GREEN, and JERRY MILLICAN unlawfully, willfully, and knowingly did combine, conspire, confederate and agree together and with each other and with their co-conspirator Richard Baker and other unknown parties, to commit an offense against the United States, to wit, Title 18, United States Code, Section 1503, that is, to corruptly endeavor to influence, obstruct and impede the due administration of justice in the United States District Courts for the Eastern District of Louisiana and the Southern District of Texas in that knowing that one Richard Baker had received a subpoena to appear as a witness before the Grand Jury in the Eastern District of Louisiana on October 5, 1972, which was inquiring into possible violations of the obstruction of justice laws, and knowing that one Richard Baker had received a subpoena to appear as a government witness to testify at the trial of the criminal case then pending in the United States District Court, Southern District of Texas, United States v. Edward Partin, No. 71-H-34, originally set on October 10, 1972, which date was later extended by Court order to October 31, 1972, obtained for and rendered to Richard Baker sustenance and transportation to avoid his appearance before the Grand Jury in the Eastern District of Louisiana and to give false material declarations as a witness in the Southern District of Texas in the criminal case United States v. Edward Partin, No. 71-H-34.
 The count then alleged a series of eighteen overt acts.
 
 
 [4]
 Count II charged, Record Vol. 1 at 4-5:
 Beginning on or about September, 1972 and continuing until on or about November 10, 1972 in the Middle District of Louisiana, defendants EDWARD G. PARTIN, JACK P. F. GREMILLION, JR., HAROLD SYKES, BEN TRANTHAM and CROCKETT CARLTON, unlawfully, willfully and knowingly did combine, conspire, confederate and agree together and with each other and with their co-conspirators, Claude W. Roberson, Mitchell Husser and other unknown parties, to commit an offense against the United States, to-wit, Title 18, United States Code, Section 1503, that is to corruptly endeavor to influence, obstruct and impede the due administration of justice in the United States District Court for the Southern District of Texas in that knowing that one Claude W. Roberson was a material Government witness at the trial of the criminal case, then pending in the United States District Court, Southern District of Texas, United States v. Edward Partin, No. 71-H-34, originally set on October 10, 1972, which date was later extended by Court order to October 31, 1972, did persuade and influence the said Claude W. Roberson to go into hiding to avoid his appearance as a witness at the aforementioned trial and did obtain for and render to Claude W. Roberson sustenance and transportation to avoid such appearance as a witness.
 The count then alleged a series of seven overt acts.
 
 
 [5]
 Count III charged, Record Vol. 1 at 6-7:
 Beginning November 9, 1972, and continuing until January 24, 1973, in the Middle District of Louisiana, defendants EDWARD G. PARTIN and O. ROMAINE RUSSELL unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other and with their co-conspirator Richard Baker and other unknown parties to commit an offense against the United States, to-wit: Title 18, United States Code, Section 1503, that is, to corruptly endeavor to influence, obstruct, and impede the due administration of justice in the United States District Court for the Middle District of Louisiana in that knowing that one Richard Baker had been a witness and had testified before the Grand Jury in the Middle District of Louisiana on November 9, 1972, which Grand Jury was inquiring into possible violations of the obstruction of justice laws, obtained for and rendered to Richard Baker counsel sustenance, employment, and money for the purpose of influencing Richard Baker to repudiate his grand jury testimony and later to give false material declarations as a witness in the said grand jury proceedings in the Middle District of Louisiana.
 The count then alleged a series of seven overt acts.
 
 
 [6]
 Ironically, our decision in Brasseaux was rendered on March 5, 1975, the day after Judge Scott instructed the jury in Partin's case. It is to Judge Scott's credit that he did not give the instruction in any of the trials that took place after Brasseaux was announced
 
 
 [7]
 In Marionneaux we also held that joinder of Count I and Count II defendants was reversible error. 514 F.2d at 1248-49. The government's assertion that our statements concerning the "slight evidence" instruction therefore were dicta plainly is wrong, for we made it clear that defendants "assert(ed) two meritorious arguments for reversal." Id. at 1247 (emphasis added). It could just as well be argued that the slight evidence instruction was the ground for reversal, and the comments about joinder were dicta. We regard both branches of the case as equally binding on us
 
 
 [8]
 The government's argument that we should search for harmless error or for cure relies principally on the line of cases that followed in the wake of our holding in Mann v. United States, 319 F.2d 404 (5th Cir. 1963). In Mann we held that it was plain error to instruct that "unless the contrary appears from the evidence," the jury could infer that the defendant intended the natural and probable consequences of his acts, because the instruction wrongly shifted the burden of proof to the defendant. After Mann, however, there followed a complex series of cases where we looked to the whole of the evidence or to other portions of the instructions to find that the erroneous Mann charge was harmless or had been cured. See United States v. Chiantese, 546 F.2d 135, 136-37 (5th Cir. 1977), and cases discussed therein
 As we have indicated, Hall bars us from relying on this series of cases after Mann for authority to search for harmless error or cure when the "slight evidence" instruction is given. We also note that a conflict has arisen within this circuit over whether we should continue to search for harmless error or cure when the Mann charge is given. Compare United States v. Chiantese, supra, with United States v. Roberts, 546 F.2d 596, 598-99 (5th Cir. 1977). We have granted a rehearing en banc in Chiantese to resolve this question. 546 F.2d 139 (5th Cir. 1977).
 
 
 [9]
 In any event, we doubt whether, as Partin asserts, Baker would have been free simply to ignore the grand jury subpoena if the grand jury had been proceeding without jurisdiction. The proper method for Baker to contest the grand jury's jurisdiction to issue the subpoena (if he were free to do so at all, see Blair v. United States, 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979 (1919)) would have been to file a motion to quash, not to ignore it. "A subpoena has never been treated as an invitation to a game of hare and hounds, in which the witness must testify only if cornered at the end of the chase." United States v. Bryan, 339 U.S. 323, 331, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950)
 And even if Baker had a right to ignore the subpoena, that would not necessarily mean Partin had the right to conspire to induce him, for corrupt purposes, to do so. Cf., e. g., United States v. Cioffi, 493 F.2d 1111, 1119 (2d Cir.), cert. denied, 419 U.S. 917, 95 S.Ct. 195, 42 L.Ed.2d 155 (1974) (holding that one who, with corrupt motive, advises grand jury witness not to testify on Fifth Amendment grounds, which grounds witness has right to invoke, violates § 1503); Cole v. United States, 329 F.2d 437, 439-43 (9th Cir.), cert. denied, 377 U.S. 954, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964) (accord).
 
 
 [10]
 Whoever . . . corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both
 
 
 [11]
 Whoever corruptly, or by threats or force, or by any threatening letter of communication, endeavors to influence, intimidate, or impede any witness, in any court of the United States . . . shall be fined not more than $5,000 or imprisoned not more than five years, or both
 
 
 [12]
 Jack P. F. Gremillion, Jr. testified for the government at Partin's trial. Partin's counsel wanted to call Gremillion's wife in order to elicit testimony that he hoped would impeach Gremillion. Gremillion had been arrested on September 17, 1973 on an unrelated federal mail fraud charge. That night, at his home, he gave the U.S. Attorney for the Middle District of Louisiana, Douglas Gonzales, a statement concerning his part in the Count II conspiracy. During proceedings before his own scheduled trial, Gremillion tried to have this statement suppressed on the ground that he had given it in return for a promise by the U.S. Attorney that he would not go to prison on any federal charges
 At the motion to suppress hearing, Mrs. Gremillion testified that her husband had told her the night he was arrested, before he gave the statement, that such a deal had been struck. Record Vol. 16. The district court at that proceeding, after hearing testimony by four other witnesses that no deal had been struck, denied Gremillion's motion to suppress. It was the story of this supposed deal that Partin's counsel wanted to elicit from Mrs. Gremillion, in order to show Gremillion's supposed interest and bias. When she was called, Mrs. Gremillion raised a Fifth Amendment claim, and the district court held a hearing on it out of the jury's presence.
 At this hearing, Mrs. Gremillion, who was represented by counsel, stated under oath that her testimony about the supposed deal would be the same if she testified at Partin's trial as it had been at her husband's motion to suppress hearing. Record Vol. 39 at 3957, 3959. She said she was afraid that if she gave such testimony again, she would be indicted for perjury in connection with either the motion to suppress hearing or the Partin trial. Id. at 3958. The government indicated that it would not seek a perjury indictment in connection with Mrs. Gremillion's testimony at the motion to suppress hearing, but it refused to commit itself if she repeated the testimony at Partin's trial. Id. at 3962-64. At the conclusion of this hearing, the district court denied Mrs. Gremillion's Fifth Amendment claim. Id. at 3967.
 After this ruling, a new problem was injected into the proceeding by the government. At her husband's motion to suppress hearing, Mrs. Gremillion also had been questioned briefly about a telephone call she had made to Gonzales after her husband's arrest on the mail fraud charge. She stated that she had made the call at Partin's request, and that Partin had tape recorded it. Record Vol. 16 at 210-13. She did not state what the substance of her conversation with Gonzales had been.
 After the district court had denied Mrs. Gremillion's Fifth Amendment claim, the government stated that it might want to pursue the matter of the phone call Mrs. Gremillion had made at Partin's request, and other dealings she had had with Partin, on cross-examination of Mrs. Gremillion. Record Vol. 39 at 3967-69. Partin's counsel objected on the ground that the scope of the government's cross-examination of Mrs. Gremillion should not extend to these matters, both because the government had not laid a foundation for it in cross-examination of Partin and because this testimony might be covered by a legitimate Fifth Amendment claim by Mrs. Gremillion. Id. at 3969. The government countered that its cross-examination of Mrs. Gremillion could not be so limited, and after a discussion that shed more heat than light on the problem, id. at 3969-77, the district court reversed itself and held, on the basis of the new problem, that Mrs. Gremillion's Fifth Amendment claim should be sustained. Mrs. Gremillion hence did not testify at Partin's trial, and Partin declined an opportunity to introduce instead the transcript of her testimony at the motion to suppress proceeding.
 
 
 [13]
 The stipulation read as follows, Government Exhibit No. 1:
 Edward Grady Partin was under indictment in a federal criminal case pending in the United States District Court for the Southern District of Texas at Houston, Texas. Richard Baker testified before the federal grand jury in New Orleans, Louisiana, which returned this indictment. Richard Baker testified that he had heard an alleged threat made by Mr. Partin on another person, which alleged threat formed the basis of the indictment against Mr. Partin.
 The trial of this criminal case against Mr. Partin was set for October 10, 1972 at Houston, Texas.
 On September 30, 1972, Richard Baker was served with a subpoena issued by the United States to testify before a federal grand jury on October 5, 1972 in New Orleans, Louisiana and with a subpoena to testify in the October 10, 1972 trial of Partin set in Houston, Texas.
 On October 3, 1972, Jerry Millican and Don Marionneaux met Richard Baker in Pittsburgh, Pennsylvania. On this occasion Don Marionneaux gave Richard Baker $50.00. Later that day, Millican, Marionneaux and Baker prepared a sworn affidavit to the effect that Baker had not heard the alleged threat by Partin. Shortly thereafter, Don Marionneaux gave Richard Baker $450.00.
 
 
 [14]
 We would add that the government's brief in Russell's case also is seriously deficient in citations to the record. See, e. g., Brief for Appellee at 10 (quote from stipulation; no citation); 11 (quote from offer of evidence; no citation); 16-17 (quotes from district court order; no citation); 18 (quote from transcript; no citation); passim. Such omission is unacceptable in any event, Fed.R.App.Pro. 28(e), and can have dire consequences for the parties. Holt v. Sarver, 442 F.2d 304, 307 (8th Cir. 1971). In a case like this one a consolidated appeal with 50 volumes of record and a number more of supplementary record our complaint is no quibble and the danger to the parties is quite real. We do not want to see such briefs again
 
 
 [15]
 18 U.S.C. § 4244 provides:
 Whenever after arrest and prior to the imposition of sentence or prior to the expiration of any period of probation the United States Attorney has reasonable cause to believe that a person charged with an offense against the United States may be presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense, he shall file a motion for a judicial determination of such mental competency of the accused, setting forth the ground for such belief with the trial court in which proceedings are pending. Upon such a motion or upon a similar motion in behalf of the accused, or upon its own motion, the court shall cause the accused, whether or not previously admitted to bail, to be examined as to his mental condition by at least one qualified psychiatrist, who shall report to the court. For the purpose of the examination the court may order the accused committed for such reasonable period as the court may determine to a suitable hospital or other facility to be designated by the court. If the report of the psychiatrist indicates a state of present insanity or such mental incompetency in the accused, the court shall hold a hearing, upon due notice, at which evidence as to the mental condition of the accused may be submitted, including that of the reporting psychiatrist, and make a finding with respect thereto. No statement made by the accused in the course of any examination into his sanity or mental competency provided for by this section, whether the examination shall be with or without the consent of the accused, shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding. A finding by the judge that the accused is mentally competent to stand trial shall in no way prejudice the accused in a plea of insanity as a defense to the crime charged; such finding shall not be introduced in evidence on that issue nor otherwise be brought to the notice of the jury.
 
 
 [16]
 28 U.S.C. § 144 provides:
 Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.
 The affidavit shall state the facts and reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.
 28 U.S.C. § 455, as amended in 1974, provides:
 (a) Any justice, judge, magistrate, or referee in bankruptcy of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
 (b) He shall also disqualify himself in the following circumstances:
 (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding; . . .
 
 
 [17]
 Judge Scott had previously accepted Gremillion's guilty plea. See Part I supra
 
 
 [18]
 Appellants also tell us that district court judges recused themselves on the two retrials of Partin's earlier Hobbs Act indictment, see Part I supra, and they seem to argue that these recusals represent either established practice or legal precedent for their case. This argument fails for a number of reasons. First, such a limited number of examples falls far short of establishing a uniform practice; in fact, appellants themselves also tell us that the judge who presided over the the third Hobbs Act trial refused to recuse himself for what would have been the fourth trial, had the government not dismissed the indictment at that point
 Second, the reasons why the two judges recused themselves are not part of the record before us now. Their actions would not be binding legal precedent for us in any event; but without knowing the grounds for their actions, we cannot even look to these instances for their persuasive value.
 
 
 [19]
 Prior to its 1975 amendment, Rule 32(c)(1) provided, "The (pre-sentence) report shall not be submitted to the court or its contents disclosed to anyone unless the defendant has pleaded guilty or has been found guilty."
 
 
 [20]
 (T)he mere fact that the trial judge had ruled against (defendant) in an earlier appearance before his court does not ipso factor render the trial judge biased. Our judicial system does not provide for no-deposit/no-return judges, disposable after one use. An accused cannot be allowed to find himself immune from the law simply because he has run through every judge within his venue, and 'used' judges must simply be recycled
 
 
 [21]
 (A) trial judge in a criminal case is often placed in the position of being exposed to (background information regarding the defendant) in the course of pretrial proceedings such as motions to suppress or quash. See Smith v. United States, 5 Cir. 1966, 360 F.2d 590. Such a problem is inherent in the federal criminal justice system, in that a limited number of federal judges must try a multitude of defendants, many of whom have committed multiple crimes or have previously been tried for crimes in the same district
 See also United States v. De La Fuente, 548 F.2d 528, 541 (5th Cir. 1977).
 
 
 [22]
 We note in passing that the Seventh Circuit apparently has experimented with a Circuit Court Rule providing that cases remanded after appeal should be retried before a different judge. See United States v. Crovedi, supra 467 F.2d at 1038; see also United States v. Parker, 447 F.2d 826, 829 n.4 (7th Cir. 1971). That court also has held, however, that the rule "does not, of course, require reversal of cases retried before the rule was made effective." United States v. Crovedi, supra, 467 F.2d at 1038. Although nothing we say today precludes this court from adopting such a rule as a matter of policy, we do agree with the Seventh Circuit that such a rule is not required by law
 
 
 [23]
 Rule 21(a) provides:
 The court upon motion of the defendant shall transfer the proceeding as to him to another district whether or not such district is specified in the defendant's motion if the court is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district.
 
 
 [24]
 Counsel for appellants tells us, incorrectly, that the voir dire was not transcribed. Brief for Appellants at 26. The government likewise makes no reference to this transcript. Brief for Appellee at 14-15. We refer both to what we said in footnote 14 supra
 
 
 [25]
 Rule 14 provides:
 If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection in camera any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.
 
 
 [26]
 This sentence of the instruction appears to be derived from Broadbent v. United States, 149 F.2d 580, 581 (10th Cir. 1945), where it was said that "any endeavor to influence a witness or to impede and obstruct justice falls within the connotation of the word ('corruptly')." Accord, United States v. Cohen, 202 F.Supp. 587, 588 (D.Conn.1962). Broadbent, in turn, relied on Bosselman v. United States, 239 F. 82 (2d Cir. 1917). In Bosselman the court answered a contention that defendant's request that another person alter certain documents was not undertaken "corruptly" within the meaning of § 1503 (then § 135) because the request was not accompanied by a bribe:
 The word 'corruptly' is capable of different meanings in different connections. As used in this particular statute, we think any endeavor to impede or obstruct the due administration of justice in the inquiries specified is corrupt. To construe the acts as requiring that such an effort should be accompanied by payment or promises of payment of money would quite unreasonably restrict the obvious purpose of the legislation.
 Id. at 86 (emphasis added), accord, United States v. Polakoff, 121 F.2d 333, 335 (2d Cir.), cert. denied, 314 U.S. 626, 62 S.Ct. 107, 86 L.Ed. 503 (1941). From its citation of Bosselman, it is clear that the Broadbent court meant only that any means of "influencing" a witness not to testify truthfully was "corrupt" not that advising a witness to testify truthfully was.
 
 
 [27]
 In fact, it is difficult to imagine a case where a person endeavored to "intimidate" or "impede" a witness non corruptly. It seems likely that the jury would understand "influence" in conjunction with "intimidate" and "impede," and conclude that "influence" did not refer to an "influence" to tell the truth
 
 
 [28]
 Appellants do not complain that the jury was instructed under both the first and the third clause of § 1503. We do not think this was prejudicial, see Part II.B. supra, and therefore do not notice it as plain error
 
 
 [29]
 Millican's testimony on these points was as follows, 1st Supp. Record (No. 75-4155) Vol. 3 at 526:
 Q. (by the government) Are you living with your family now?
 A. (by Millican) No.
 Q. And what are the circumstances under which you are living under right now?
 A. Since March or April of 1973 I have been under the witness security program, which is administered by the United States Marshal Service under the Department of Justice.
 Q. Just basically what is the witness security program?
 A. Basically the service provides me with subsistence, money for my family and money for myself. I get a total of a thousand, eighty dollars a month of which five hundred and fifty dollars now goes to my family and I use the remaining five hundred and thirty for my subsistence.
 Q. Do you go under your name Jerry Millican?
 A. No.
 Q. Do you have another name that you go by?
 A. I have a name and a social security number that was given to me by the United States Marshal service at the time I entered the program in April, I think, of 1973.
 Q. You have been living under that name since then?
 A. Yes, sir.
 
 
 [30]
 Title V provides as follows:
 Sec. 501. The Attorney General of the United States is authorized to provide for the security of Government witnesses, potential Government witnesses, and the families of Government witnesses and potential witnesses in legal proceedings against any person alleged to have participated in an organized criminal activity.
 Sec. 502. The Attorney General of the United States is authorized to rent, purchase, modify, or remodel protected housing facilities and to otherwise offer to provide for the health, safety, and welfare of witnesses and persons intended to be called as Government witnesses, and the families of witnesses and persons intended to be called as Government witnesses in legal proceedings instituted against any person alleged to have participated in an organized criminal activity whenever, in his judgment, testimony from, or a willingness to testify by, such a witness would place his life or person, or the life or person of a member of his family or household, in jeopardy. Any person availing himself of an offer by the Attorney General to use such facilities may continue to use such facilities for as long as the Attorney General determines the jeopardy to his life or person continues.
 Sec. 503. As used in this title, 'Government' means the United States, any State, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof. The offer of facilities to witnesses may be conditioned by the Attorney General upon reimbursement in whole or in part to the United States by any State or any political subdivision, or any department, agency, or instrumentality thereof of the cost of maintaining and protecting such witnesses.
 Sec. 504. There is hereby authorized to be appropriated from time to time such funds as are necessary to carry out the provisions of this title.
 
 
 [31]
 In fact, the first paragraph quoted above, which instructs that the jury should view with caution evidence from a witness who has received benefits "whether they be received in money, in protective custody afforded by the Government or any other benefit," tends to cast doubt on Millican's credibility because of his participation in the witness security program