**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Emil CROVEDI et al., Defendants-Appellants.**

**Nos. 18423, 18498–18500.**

United States Court of Appeals, Seventh Circuit.

Sept. 29, 1972.

Rehearing Denied Nov. 2, 1972.

**1034**

John Powers Crowley, Edward J. Calihan, Robert S. Bailey, Chicago, Ill., for defendants-appellants.

James R. Thompson, U. S. Atty., James S. Montana, Jr., Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before HASTINGS, Senior Circuit Judge, and FAIRCHILD and KERNER *, Circuit Judges.

FAIRCHILD, Circuit Judge.

Defendants were convicted by a jury of (I) conspiracy [1] to steal and possess goods moving as an interstate shipment of freight and (II) theft [2] of certain cameras, photographic material, and film, part of an interstate shipment of freight from Polaroid Corporation. They had previously been convicted, under an earlier indictment, of the same substantive offense and (with others, convicted of other substantive offenses) of participation in a broader conspiracy. The earlier convictions were reversed by this court in United States v. Varelli [3] for the reason that "two conspiracies were proved instead of the one charged" and that under the circumstances, related in the decision, the rights of the defendants in *Varelli* (including these and others) "were substantially prejudiced by a single trial without proper instructions."

After remand, pursuant to *Varelli*, the government obtained several superseding indictments. The one with which we are now concerned named as defendants Bambulas (who is not an appellant), Nielsen, Crovedi, Bratko, and Rossi. The facts appearing at trial under this indictment are adequately set out in *Varelli* under the heading "POLAROID SHIPMENT". We will refer only to such facts as necessary for discussion of the claims of error.

We affirm the convictions.

■ 1. *Restriction of cross-examination.* The principal witnesses for the government were Patrick Schang and Richard Frederick, admitted participants in these offenses, who had pleaded guilty to the earlier indictment and were named as conspirators but not as defendants in this one. Both were in the apparent

---

* Judge Kerner heard oral argument, but did not participate in the adoption of this opinion.

1. 18 U.S.C. § 371.

2. 18 U.S.C. § 659.

3. 407 F.2d 735 (7th Cir., 1969).

situation of giving devastating testimony against their former partners and of cooperating with the government in return for leniency for themselves. Both testified that they had moved their families from the homes they had at the time of the offenses and are presently employed and living with their families under assumed names. The court refused to require Schang and Frederick to give their present names, addresses, and employment. Defendants assign error.

The court not only had before it the general situation at the present, as well as the earlier, trial, but held a voir dire out of the presence of the jury.

Each described statements by one or more of the present defendants or others indicating he would have reason to fear for his life if he cooperated with the government. Each said he would refuse to give his present identification because of fears for the safety of his family and himself. Each said that the only people who had known him by his former name and knew his present identification were two FBI agents. It was developed that two participants in the Polaroid offense, Boscarino and Mendola, had met violent death, although there was no assertion as to who was responsible. Boscarino appeared to have been tortured before being killed. Each witness has testified against other persons in other criminal cases. There are at least overtones suggesting that they were members of a criminal community of some sort and are violating a code.

We find no abuse of discretion in a determination that these witnesses had reason to fear that disclosure of their present identities would endanger themselves and their families. Many facts, very probably the most significant in

raising questions concerning their credibility, were fully explored on cross-examination.

Defendants seem to argue that the general rule of *Alford* [4] and Smith v. Illinois [5] entitling a defendant to ask a government witness where he lives is an unvarying absolute, not subject to any discretionary exception where the personal safety of the witness would be endangered.

This circuit has concluded that there is such an exception for the reasons explained in a decision involving the same Polaroid shipment, a superseding indictment after *Varelli*, and the witness Schang.[6] Other decisions of this and other circuits to the same effect are there cited.

Defendants' argument that Shaw v. Illinois [7] amounts to a holding by the Supreme Court that the exception does not exist is not persuasive. In *Shaw* the Supreme Court vacated the judgment and remanded a case in which a state appellate court had upheld withholding of a witness' address "to protect her from a possible reprisal".[8] On remand, the state court decided the other way, but noted that in fact the record contained "no evidence of danger to the witness".[9] *Shaw* is consistent with the proposition that an exception may be made when there is proper support.

■ 2. *Instruction on the weight to be given a defendant's testimony.* The court gave a standard instruction with respect to the jury's determination of the credibility of witnesses and weight of testimony. It included an admonition to consider the witness' interest, if any, in the outcome of the case. Two defendants, Bratko and Rossi, testified and asked for an instruction that a defendant who wishes to testify is a com-

4. Alford v. United States, 282 U.S. 687, 51 S.Ct. 77, 75 L.Ed. 736 (1931).

5. 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968).

6. United States v. Saletko, 452 F.2d 193, 196 (7th Cir., 1971), cert. den. 405 U.S. 1040, 92 S.Ct. 1311, 31 L.Ed.2d 581.

7. 394 U.S. 214, 89 S.Ct. 1016, 22 L.Ed. 2d 211 (1969).

8. People v. Shaw, 89 Ill.App.2d 285, 233 N.E.2d 73, 78 (First Dist., Fourth Div., 1967).

9. People v. Shaw, 117 Ill.App.2d 16, 254 N.E.2d 602, 605 (footnote 2).

petent witness, and his testimony is to be judged the same way as that of any other witness. Instead the court gave an instruction which said, in part, "However, in weighing his testimony, the jury should consider the fact that the defendant has a vital interest in the outcome of this trial."

It is not error to give such an instruction, pointing separately to the defendant's interest in the outcome.[10] Arguably it may be better practice, as has been suggested,[11] not to treat separately the interest of a defendant who testifies, and either to revise the general instruction so as expressly to include a defendant, where one has testified, or to use the phrasing requested here. We are not persuaded, however, that the instruction given was prejudicial.

■ 3. *Whether a statement of Nielsen was volunteered.* When Nielsen was arrested, he was given appropriate warnings and responded that he had an attorney and did not want to talk about the matter. There was testimony that thereafter he volunteered two statements which tended to incriminate by suggesting that the proceedings against him must be based on information supplied by Schang. There is no issue concerning the voluntary character of these statements, but it is contended that a third statement was not volunteered. The claim is that the statement was a response to interrogation, and that the interrogation was unlawful because of Nielsen's assertion that he did not want to discuss the matter.

The arresting agents had searched Nielsen's apartment at the time of arrest.[12] They found seven mounts for Polaroid color pictures and an instruction manual. The government introduc-

ed proof that items of this type were included in the shipment stolen in 1964 and that identical mounts were not produced after August, 1965. The arrest and seizure occurred April 19, 1966.

One of the agents testified that after arrival at the FBI office, "We asked him if he would sign this receipt acknowledging that these were all of the items that we had from his house and no others. He then stated, 'You can buy that stuff in any drugstore that sells Polaroid film. I will never sign it.' Then he stated, 'Maybe I should buy a Polaroid Land Camera.'"

The agent testified they did not ask him any questions about the items seized, except to sign the receipt. He acknowledged that the record of the prior trial showed that his testimony had been, "We asked him whether he had anything to say about him, and he said 'You can buy that kind of junk in any drugstore . . .'" etc. It seemed to be agreed that the word "him" was a typographical error. Asked at this trial by Nielsen's attorney, "Did you say, 'We asked whether he had anything to say about them'" the agent answered "That is an incorrect statement. I did not ask him that." In subsequent answers he continued to testify that Nielsen's statement had been made in answer to the request for the receipt. The trial judge found that the statement was not the result of any interrogation, and ruled, after voir dire, that the agent's testimony concerning the statement would be admitted. The credibility of the agent was resolved by the trial judge, and we conclude his finding was not clearly erroneous.

■■ 4. *Witness' prior unsuccessful attempt at identification.* Frederick

---

10. Reagan v. United States, 157 U.S 301, 305, 15 S.Ct. 610, 39 L.Ed. 709 (1895) ; United States v. McCarthy, 295 F.2d 356 (7th Cir., 1961).

11. See Taylor v. United States, 390 F.2d 278, 285 (8th Cir., 1968) ; Carrigan v. United States, 405 F.2d 1197, 1198 (1st Cir., 1969).

12. Nielsen's challenge of the search is based only on a retroactive application of Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), but the Supreme Court has since decided that *Chimel* is not to be applied retroactively. Williams v. United States, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971).

identified several defendants as persons who had participated in the Polaroid shipment activity. He also testified about the man he said he did not recognize and who was driving the stolen vehicle when it arrived at his garage. He was not asked whether he could identify him. Defense counsel brought out that the driver had been introduced to Frederick as Joe Rossi, but that Frederick did not know if he was in the courtroom or not. Schang later identified this driver as defendant Rossi.

During the first trial Frederick had attempted to identify the man who had been introduced to him as Rossi. He first said it was the man sitting behind Bambulas, but it appears that was Bratko. Frederick then said that was not the man and pointed out another. The latter was apparently one of the defense attorneys. It is evident from *Varelli* that there was a substantial group of defendants at that trial, and presumably a number of attorneys.

In the trial with which we are now concerned, Rossi's counsel brought out by cross-examination, including references to parts of the record of the earlier trial, that Frederick had testified he saw Rossi in the room and then pointed out the man behind Bambulas. Rossi's counsel stated, in the presence of the jury (although the government made an objection) that Frederick first pointed out Bratko and then a defense counsel. The judge stopped the colloquy and the matter was later discussed in the absence of the jury. Rossi claims error in that the judge did not permit his counsel to read to the jury the full record of the attempts at identification at the first trial.

We are at a loss as to the exact rationale contended for by counsel. We do not understand that anyone interprets the

record of the first trial as positive testimony by Frederick, contradicting Schang, that either Bratko or the defense counsel pointed out was really the driver. Rather it seems to have established only the fact that Frederick could not pick the driver out of the sizable group if in fact he was present. There is no real inconsistency between his inability as demonstrated in the first trial and his testimony in the second that he did not know whether the driver was in the courtroom or not.

Prior statements may, of course, be used to impeach the credibility of a witness, but this can be done only if the judge is satisfied that the prior statements are in fact inconsistent.[13]

. Defendant Rossi cites two cases in which a government witness stated a positive opinion or identification and in which the courts decided on appeal that fairness required an opportunity for the defendant to show an earlier, equally positive, closely related opinion or identification in which the same witness was clearly mistaken.[14] In the trial now under review the witness attempted no identification of the driver and admitted he couldn't tell whether he was present or not.

Defendant Rossi also cites United States v. DeSisto[15] in which a witness made a positive identification of defendant at a second trial, but on cross-examination virtually retracted it. The witness had made a positive identification at the first trial, as well as on other occasions, and the court approved consideration of the first trial identification for its truth, as well as its impeaching effect.

If it be Rossi's theory that the identification fiasco at the first trial amounts to positive testimony by Frederick, not immediately abandoned, that either Brat-

13. Grunewald v. United States, 353 U.S. 391, 418, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957) ; see also Ikerd v. Lapworth, 435 F.2d 197, 207 (7th Cir., 1970).

14. McConnell v. United States, 393 F.2d 404 (5th Cir., 1968) ; DeLilly v. State, 11 Md.App. 676, 276 A.2d 417 (1971).

15. 329 F.2d 929 (2d Cir., 1964), cert. denied 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747.

ko or one of defense counsel was the driver, and hence not Rossi, we do not so interpret the record. It would probably have done no harm for the judge to have permitted the reading of this portion of the earlier record, as he once indicated he would do, but we find no abuse of discretion in his ultimate decision to the contrary.

5. *Denial of motion to recuse.* After the decision of this court in *Varelli,* reversing the convictions of these and other defendants in a much wider alleged conspiracy, the government obtained new indictments, each of narrower scope. They were assigned to the same judge who had presided over the earlier trial. Rule 10 of the General Rules of the District Court so required, doubtless implementing a policy judgment in favor of assigning all related cases to the judge most familiar with the matters they have in common.

Defendant Nielsen filed a motion asking that the judge recuse himself, and citing the previous proceedings, including the conviction, revocation of bond, imposition of maximum sentence, denial of motion for bond on appeal, reversal, the judge's finding in denying bond that Nielsen would be a danger to the community if released, the judge's knowledge of the pre-sentence report and Nielsen's arrest record. Because any possible bias of the judge was acquired solely from presiding over the proceedings, Nielsen's motion conceded that "Under the cases defendant does not have a valid motion under Section 144, Title 28, United States Code". The motion went on to suggest, however, that the judge would have a predisposition toward guilt and would have a tendency toward vindication of his previous official actions, such as denial of bail pending appeal.

The judge denied Nielsen's motion and there is no need for extended discussion as the concession was clearly correct as a matter of law.[16]

Defendants allege that after the first trial confidential reports were provided by the prosecution and considered by the judge in deciding to deny bail. Assuming there were such reports, subject prospectively to the rule in United States v. Solomon, 422 F.2d 1110, 1121 (7th Cir., 1970), the second trial in this case, as well as the consideration of the denial of bail after the first trial, preceded the decision of *Solomon.*

We have recently adopted Circuit Rule 23, effective April 23, 1972, providing that when a case tried in a district court is "hereafter" remanded for a new trial, it shall be reassigned for trial before a different judge unless otherwise directed by this court or requested by the parties. The policy judgment underlying the rule, for prospective application, does not, of course, require reversal of decisions in cases retried before the rule was made effective.[17]

6. *Claim that there were demonstrations of bias on the part of the judge sufficient to deprive defendants of a fair trial.* Defendants have offered several instances during the course of the trial which they contend demonstrate the bias of the court and resulting impairment of a fair trial. Presumably the prejudice, if existing as claimed, would foreclose reliance on the fairness of discretionary determinations made by the judge during the trial or, where exhibited to the jury, would produce the danger that the jury was influenced by the judge's opinion as to the facts.

We are mindful of the need for a trial judge to maintain fairness and an atmosphere of impartiality throughout the trial and have carefully scrutinized the instances complained of, as well as the whole transcript, in the light of these considerations.

It is our considered evaluation that the record does not support the claim of

---

16. See United States v. Grinnell Corp., 384 U.S. 563, 583, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

17. Cf. United States v. Parker, 447 F.2d 826, 829 (7th Cir., 1971).

demonstrated bias and impairment of fair trial.

■ a. A problem arose as a result of Schang's phrasing of an answer and questions asked of him on cross-examination by counsel for Bratko and Rossi. Schang's life of criminal activity was generally explored. He admitted a number of specific offenses, but he testified he could not say how many hijackings he had been involved in, except that there were more than ten before the Polaroid one.

Counsel for Nielsen asked him: "Q. And how many? A. I can't give you a number. Q. Well, can you give me a rough estimate? A. Well, we were out on the streets everyday. Q. You, you involved. I am not talking about other people. I want to know how many you were involved in. A. Well, I never went by myself. It was always 'us'. Q. I see. Well, how many did you or 'us' involve yourselves in other than the four at which you have testified between April—Between August 1964 and October of 1965? A. I really don't know, sir."

We interpret the reference to "we" and "us", in context, as meaning that Schang always operated with other persons, but not any particular group or persons. The trial judge understood it that way, and we surmise that several defense counsel did. Counsel for Bratko and Rossi, however, was not satisfied to let it go on that basis. On cross-examination, he asked, in effect, whether "us" referred to his clients in connection with the hijacking of loads of silver to which Schang had referred. The court sustained an objection. Counsel then asked Schang whether his clients were involved in a particular bank robbery admitted by Schang, or the silver truck hijackings. Schang responded they were not.

Out of the presence of the jury, Crovedi's counsel moved for a mistrial because he thought the above cross-examination left an inference that the "us" included the rest of the defendants. Nielsen's counsel wanted to reopen his cross-examination to ask the same question asked on behalf of Bratko and Rossi. The Court refused. Counsel for Nielsen and Bambulas moved for a mistrial.

The judge recognized the problem of possible unfairness to the other defendants and sharply criticized counsel for Bratko and Rossi for creating it, pointing out that Schang's other crimes were not relevant. The discussion became somewhat heated.

The question already asked was near the end of extended cross-examination. A new question, on behalf of Nielsen, might well have been emphasized by the reopening of cross-examination. And it was known that Schang would testify that Bambulas was involved in the silver hijackings, so that his counsel could not afford to ask a similar question.[18]

The judge did not permit further questions about the "us", but ultimately instructed the jury: "You heard testimony from the witness Patrick Schang that he has been involved in a number of other hijackings and other crimes. This evidence relates solely to the witness Schang and may be considered by you only with reference to his credibility.

"Furthermore only the charges contained in the present indictment are for your consideration. You may not consider or find anyone guilty of any offense not charged in this indictment."

We think that the judge did not abuse his discretion in his resolution of the problem and that neither his rulings nor his criticism of counsel for Bratko and Rossi established bias or unfairness.

■ b. In cross-examination of Schang, counsel for Nielsen asked a series of repetitive questions about Schang's motivation in deciding to plead guilty and cooperate. Apparently as an intended question, counsel stated a summary of a previous question and answer. Government counsel objected, and the judge said: "I think that you have covered

---

18. See *Varelli*, Appendix B, 407 F.2d at 752.

it, Mr. Calihan, without gilding the lily further. I mean, I think you have covered it. . ."

Use of the metaphor was, of course, unnecessary, but it was apt, since the subject had indeed been covered. We do not find that the phrasing demonstrates prejudice, or appeared to inform the jury of the judge's opinion on the issue the jury was to decide.

■ c. The government produced a local employee of Polaroid Corporation who identified certain documents as to the contents of the stolen shipment. It developed on cross-examination that his testimony as to the final date of manufacture of the type of picture mounts found in Nielsen's possession did not reflect his own knowledge, but had been obtained by him by telephone from the home office of the company in Massachusetts where the records were.

Government counsel said he could bring someone from Cambridge "or if counsel is willing to stipulate. . ." Counsel for Nielsen objected to the remark before the jury and moved for a mistrial, which the judge denied. A short colloquy followed, which we regard as wholly insignificant.

The next morning the government produced a witness from the home office who testified to the dates between which the particular type of mounts was produced. At the end of his testimony the following took place:

"THE COURT: Did you come out here from Cambridge, Massachusetts, this morning?

"THE WITNESS: Yes, I did, your Honor.

"THE COURT: To give this testimony, is that right?

"THE WITNESS: That is right.

"THE COURT: Cross-examine, gentlemen."

On cross-examination by counsel for Nielsen, the judge very strictly limited the questions to the scope of the direct, saying, in colloquy: "He was brought here for one specific purpose. You may examine him on that and that alone."

There isn't much question that the judge felt and indicated some impatience with the insistence of counsel for Nielsen that the government fulfill strict evidentiary rules in establishing this particular point. While the defense had the right to stand on the rules, we can understand the impatience under the particular circumstances, although it should not have been expressed. We can not, however, view the matter as of significant importance in the entire trial.

■ d. An FBI agent testified to remarks volunteered by Nielsen at the time of the arrest and on the ride to the FBI office. He was cross-examined. Nielsen had referred to Schang's cooperation with the government. The judge is said to have shown prejudice by sustaining several objections during this cross-examination. There is a significant difference in this context between what Nielsen said to the agent about Schang's cooperation and the facts the agent himself may have known about such cooperation. It appears to us that the judge correctly sustained objections to questions in the latter area and that the rulings do not indicate bias.

■ e. On the morning of January 29, the last day of trial, counsel for Nielsen informed the court that his client had led him to believe that Nielsen's mother "owns the camera, a 100 Polaroid"; that the mother was to come to counsel's office that day "so that I could question her and determine whether or not to use her"; that her brother died at 7:00 that morning. It was not then certain whether the trial would extend into the following day. The judge noted that the mother had not testified at the first trial and made no definitive ruling.

The testimony ended at 2:45 that afternoon and other defendants rested. Nielsen's counsel asked that the trial be continued until the next day "in an effort to get her in here." The judge denied the motion.

If the picture mounts found at Nielsen's apartment in 1966 were there because his mother owned a camera, Nielsen must have known that at that time, and at the time of the first trial when it was important to explain their presence, and at the beginning of the second trial. Yet counsel had not yet interviewed her to decide whether she should be a witness. Under the circumstances we find no abuse of discretion or evidence of bias in denial of the continuance.

f. We have examined other comments referred to in the briefs as indicating that after conviction in the earlier trial the judge had received confidential information which, although received in the course of his judicial duties, made it inappropriate for him to preside at the second trial.

Our evaluation of the entire record, after giving consideration to the claims asserted, is that the trial was fairly conducted.

The judgments are affirmed.