In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-4056

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ALEXANDER VASQUEZ, JR.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:08-cr-00625-3—**Charles R. Norgle, Sr.**, *Judge.*

ARGUED NOVEMBER 5, 2010—DECIDED MARCH 14, 2011

Before EVANS, SYKES, and HAMILTON, *Circuit Judges*.

EVANS, *Circuit Judge*. A jury convicted Alexander Vasquez of conspiring to possess more than 500 grams of cocaine with intent to distribute. He was subsequently sentenced to serve a term of 240 months. On appeal, Vasquez asks us to reverse his conviction and remand the case for a new trial on several grounds: that the judge (1) should have excluded evidence of his prior drug conviction; (2) should have granted his motion to

suppress evidence found in a warrantless search of an automobile; (3) deprived him of a meaningful opportunity to cross-examine a government witness; and (4) should not have admitted recordings of telephone conversations between a defense witness and a co-defendant. We begin with the facts.

Vasquez and two co-defendants, Joel Perez and Carlos Cruz, were arrested in Arlington Heights, Illinois, following a failed cocaine transaction. The day's events started in the parking lot of a Shell gas station, moved to a nearby parking lot at a Denny's Restaurant, and finally to the shared parking lot of a Walmart and McDonald's. The deal that flopped began several days earlier when Perez contacted Cruz about obtaining a kilogram of cocaine. Cruz then called Alejandro Diaz, whom he knew to be involved in cocaine deals. Cruz, however, didn't know that Diaz was cooperating with law enforcement agents. Cruz, Perez, and Diaz arranged for a deal to go down in Arlington Heights on August 5, 2008.

On the day that it all came tumbling down, Cruz and Perez, with Cruz driving, went to the Shell station for the deal. There, they met Diaz who instructed them to follow him to another location to get the cocaine. Instead, Perez walked to the Denny's parking lot next door where Vasquez was waiting for him in a black Bonneville. Perez slid into the passenger seat of the car and called Cruz on a cell phone telling him that he was not willing to follow Diaz; he wanted to complete the deal at the current location. Cruz then went to the Denny's lot where he was introduced to Vasquez. Shortly

thereafter, Diaz called Cruz to find out why they were not following him. Cruz told Diaz that Perez wanted to complete the deal in the parking lot. Perez told Cruz to tell Diaz that "we got the money here." Vasquez repeated the statement, "tell him we got the money here." Cruz hung up with the understanding that Diaz was returning to complete the deal.

Several minutes later, and after Diaz contacted his handler, DEA Agent James Chupik, law enforcement agents surrounded the parking lot and approached the Bonneville to arrest Cruz, Perez, and Vasquez. In addition to several unmarked cars, six officers approached the Bonneville on foot. As the officers approached, Cruz, who was outside of the car, raised his hands in surrender. Vasquez's reaction was not nearly as submissive. He put the Bonneville in reverse, striking two Arlington Heights police cars. He then shifted gears and headed for the exit. Agent Chupik moved in front of the Bonneville, pointed his gun at Vasquez, and commanded him to stop. But Vasquez showed no signs of stopping so Agent Chupik jumped out of the way as the Bonneville sped out of the parking lot heading west onto the eastbound lanes of Algonquin Road.

A few minutes later, police located the Bonneville abandoned in a nearby Walmart parking lot. A bystander told the police he saw two men run from the vehicle toward a McDonald's. An Arlington Heights detective pursued Vasquez and Perez as they ran through the kitchen of the McDonald's and then out the back door.

At that point, Vasquez and Perez split up, each running in a different direction. But the chase was short

lived—they were quickly apprehended by Arlington Heights police. The police found a cell phone on Vasquez, and two cell phones on the ground near Perez. Phone records showed that there were calls between Vasquez and both of Perez's phones the day before and the day of the arrest.

The Arlington Heights police towed the Bonneville to the police station. During a search of the car later that day, they found a hidden compartment in the passenger side of the dashboard containing $23,000 in cash.

Based on this evidence, a federal grand jury returned an indictment charging Vasquez with conspiring to possess with intent to distribute more than 500 grams of cocaine and with attempting to possess with intent to distribute more than 500 grams of cocaine, each in violation of 21 U.S.C. § 846.

As the case progressed, Vasquez filed a motion to suppress the evidence recovered from the search of the Bonneville and the government filed a motion to admit, pursuant to Federal Rule of Evidence 404(b), evidence of Vasquez's involvement in a cocaine trans-action in 2002. The district judge denied Vasquez's motion and granted the motion filed by the govern-ment. The judge found that the police had probable cause to search the Boneville and that the 2002 cocaine transac-tion, which resulted in a conviction, was admissible to show Vasquez's knowledge and intent under Rule 404(b).

At trial, Agent Chupik testified for the government. Among other things, he testified that he instructed Diaz to have Cruz and his "customers" come to a gas station

in Arlington Heights for the transaction. But according to the actual transcript of the call, which the government later published, Cruz referred to a single customer as "him" and "this dude." On cross-examination, Vasquez's counsel attempted to impeach Agent Chupik on this point by refreshing his memory. The judge limited cross-examination, however, finding that the difference between "customers" and "customer" in this instance was a trivial detail.

Later in the trial, Vasquez called several witnesses, including Perez's wife, Marina. Later still, the judge allowed the government to recall Marina to the stand and, among other things, question her about telephone conversations she had with her husband while the case was still pending.

Ultimately, the jury found Vasquez guilty on the conspiracy count and not guilty on the attempt charge. Issues concerning the recall of Marina to the stand and the telephone conversations she had with her spouse are at the heart of Vasquez's appeal, but we will put them aside for the moment as we consider the other issues raised on Vasquez's appeal.

We begin with Vasquez's claim that the judge should have precluded the government from introducing his prior drug conviction to show his knowledge and *modus operandi* pursuant to Rule 404(b). We review the judge's ruling for an abuse of discretion. *United States v. Conley*, 291 F.3d 464, 472 (7th Cir. 2002). We will reverse only if the record contains no evidence on which the judge rationally could have based his ruling. *Id*.

Rule 404(b) provides that evidence of prior acts is admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," but not "to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b). We apply a four-part test to decide whether Rule 404(b) evidence was properly admitted and will find no error if:

> (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue; (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and (4) the evidence has probative value that is not substantially outweighed by the danger of unfair prejudice.

*United States v. Vargas*, 552 F.3d 550, 554 (7th Cir. 2008).

Here, the government introduced Vasquez's prior conviction to show that he had previously carried out a cocaine deal with Perez using a hidden compartment in a car. The evidence was not used to show propensity, but rather to show *modus operandi*. *United States v. Montoya*, 891 F.2d 1273, 1285 (7th Cir. 1989) (upholding admission of evidence under a *modus operandi* theory when prior drug offense involved the defendant working with the same person, using a car registered to another person, and using a hidden compartment in the car).

The prior drug deal with Perez was certainly important as it showed that Vasquez's position that he was merely an innocent bystander was a smoke screen. *See United States v. Chavis*, 429 F.3d 662, 668 (7th Cir. 2005) (evidence of a prior drug conviction is admissible when a defendant claims that he was "simply in the wrong place at the wrong time"); *Vargas*, 552 F.3d at 555-56 (evidence that defendant had previously transported narcotics in a trailer made it more likely that he knew about the drugs hidden in the trailer in the instant case, and less likely that he was an innocent victim).

Finally, limiting "instructions 'are effective in reducing or eliminating any possible unfair prejudice from the introduction of Rule 404(b) evidence.'" *United States v. Jones*, 455 F.3d 800, 809 (7th Cir. 2006) (internal citations omitted). Here, the judge properly instructed the jury regarding the purposes for which the Rule 404(b) evidence was introduced.

Therefore, the introduction of Vasquez's prior conviction clearly passes the admissibility test. It was admissible to show Vasquez's knowledge, intent, absence of mistake and *modus operandi*. The judge did not abuse his discretion in admitting the 2002 cocaine-related conviction.

Next, Vasquez argues that the judge should have granted his motion to suppress the money discovered during the search of the Bonneville. He argues that the police violated his Fourth Amendment rights when they conducted a warrantless search of the car after he was taken into custody. We review a district judge's denial of

a suppression motion under a dual standard: "the Court reviews legal conclusions *de novo* and findings of fact for clear error." *United States v. Jackson*, 598 F.3d 340, 344 (7th Cir. 2010).

The search issue is a dead-bang loser. For one thing, the Bonneville was abandoned, and it's hard to see, under the circumstances here, how Vasquez could argue with a straight face that he maintained an expectation of privacy in it after he ditched it and bolted off on the run. On top of that, it's clear that the pursuing police had abundant probable cause to believe that drug money was in the car. What was the probable cause? Well, (1) Cruz told Diaz that Vasquez and Perez had the money with them; (2) no money was found during the searches of Vasquez and Perez; and (3) two drug-detection dogs indicated that there were narcotics in the passenger-side dashboard of the car. The motion to suppress was properly denied.

Vasquez also claims that the judge denied him a meaningful opportunity to cross-examine Agent Chupik, in violation of his Sixth Amendment right to confront witnesses against him. "Limitations on cross-examination rise to the level of a Sixth Amendment violation when they prevent the exposure of a witness' bias and motivation to lie." *United States v. Smith*, 308 F.3d 726, 738 (7th Cir 2002). But the right to cross-examination is not without limitation:

> [T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns

> about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

*Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986). A Sixth Amendment violation occurs when the defendant shows that he was denied the opportunity to elicit testimony that would be "relevant and material to the defense*." United States v. Williamson*, 202 F.3d 974, 979 (7th Cir. 2000) (internal citation omitted). In this case, the judge found that the information Vasquez hoped to elicit from Agent Chupik, which Vasquez argues shows bias, was trivial and a collateral issue, and therefore not relevant. We review the judge's ruling for abuse of discretion. *Id*.

Vasquez argues that the judge erred by refusing to allow his counsel to attempt to impeach Agent Chupik with a supposedly inconsistent statement he made in an affidavit. Specifically, when discussing the calls between Cruz and Diaz, Agent Chupik said in his affidavit that there were "customers." In fact, the calls only refer to a single customer. The government points out, however, that in the rest of the affidavit, Agent Chupik refers to a single customer, undercutting Vasquez's argument that Agent Chupik was deliberately lying. If anything, it suggests that Agent Chupik simply misspoke. Moreover, Agent Chupik's affidavit was based on a draft transcript that had been translated from Spanish to English, and neither the draft transcript nor the affidavit were presented to the jury.

It is within the discretion of a trial judge to limit cross-examination, especially when, as here, the discrepancies

are minor. *See United States v. Mojica*, 185 F.3d 780, 788-89 (7th Cir. 1999) (district court did not abuse discretion in limiting cross-examination of a witness regarding prior drug use when the inconsistencies were "no more than minor discrepancies"). Thus, the judge did not abuse his discretion when he limited Vasquez's cross-examination of Agent Chupik.

Vasquez also argues that the judge erred in ruling that the he could not use transcripts to refresh Agent Chupik's memory. The Government acknowledges that this was an error, but responds that it was harmless because the judge ruled irrelevant the point on which Vasquez was trying to refresh Agent Chupik's memory. Evidentiary rulings are reviewed for an abuse of discretion. *United States v. Schalk*, 515 F.3d 768, 774 (7th Cir. 2008).

Vasquez is correct—the judge incorrectly stated that there was "no basis to cross-examine with respect to something not in evidence." A document does not need to be "admissible as substantive evidence in order to be used for the purposes of impeaching a witness (or refreshing his recollection)." *Pecoraro v. Walls*, 286 F.3d 439, 444 (7th Cir. 2002). But the government is correct that it is within the judge's discretion to preclude counsel from refreshing a witness' memory on a point the judge has ruled trivial and a collateral issue. Therefore, while the judge's ruling was in error, it was harmless error at best in this case.

Finally, we turn to Vasquez's primary argument, the resolution of which is where we part company with our dissenting colleague. Vasquez asserts that the district

judge erred in several respects regarding the recalling of Marina as a witness in the government's rebuttal case and, more importantly, in admitting into evidence the Metropolitan Correctional Center (MCC) recordings of her telephone conversations with her husband.

There's no doubt that Vasquez's trial would have been cleaner had Marina Perez not been injected into the show. But to put things in perspective, it's best to step back for a moment and look at the big picture. Joel Perez and Cruz pled guilty to the charges against them. Vasquez, however, elected to go to trial. Instead of relying on a generalized defense—that the government failed to prove his guilt beyond a reasonable doubt—Vasquez elected to offer something in the nature of an actual affirmative "defense" on the merits. It would be that he was only an innocent bystander who just happened to be in the wrong place at the wrong time. In the real world of criminal court trials, that sort of "defense" is difficult to sell. And it's especially hard to sell when a defendant, like Vasquez here, elects not to take the stand and tell the jury his version of how he just happened to be where the drug deal was about to go down. So how does he get this "defense" before the jury? Enter Marina. She was his only hope, and a slim one at that.

When called by Vasquez as a witness, Marina said that her husband, earlier in the day, asked her to pick him up at the place where the drug deal died. But later, she asked Vasquez to go in her place. He agreed, and he took the Bonneville, rather than his own car, only because it was more convenient to do so. So if believed,

the jury might think that Vasquez had no idea a drug deal was in play and that he just showed up by pure happenstance with a car full of cash stashed away in a hidden compartment. The *if* is a mighty big *if*, especially when one considers that the jury knew that Vasquez had participated in a remarkably similar drug deal involving cocaine, Perez, some $15,000 in cash, and a car in 2002.

The government obviously thought Marina's tale was a fish story. Based on the way the case stood at the time, the government could have let Marina leave the stand after a short cross-examination. That might have been the safest course to take. But instead, the government filed a motion to continue the trial over the weekend based on recordings it had obtained of telephone conversations between Marina and her husband, who was incarcerated at the MCC at the time. The government argued that the conversations between the two went directly to the truthfulness and accuracy of Marina's testimony and raised potential conflict-of-interest issues. Vasquez's counsel objected to the government's motion to no avail. The judge held that the MCC recordings were admissible as extrinsic evidence of Marina's interest, bias and prejudice, and of her prior inconsistent statements.

When the trial resumed, the government called Marina in its rebuttal case and published four recorded conversations between her and her husband. During questioning, Marina acknowledged that she had met with Vasquez's lawyer several times before August 20,

2009 (the only meeting she mentioned in her direct testimony). She also admitted that she understood that Vasquez's lawyer could get Perez a lower sentence and that the lawyer wanted Perez to enter a plea and avoid implicating Vasquez. Defense counsel's objection to Marina's testimony was overruled. And then the MCC recordings came in. They included this exchange:

> Marina: So what'd Beau [Vasquez's lawyer] tell him [Vasquez]? What did Beau tell him?
>
> Perez: A blind plea would be good, then he can guarantee this and that. You know what I mean? Just certain things, you know? I got to explain to you.
>
> Marina: He's telling him about a blind plea also?
>
> Perez: Yeah, he is. I gotta explain to you. You know what I mean. He says, if you want, have his wife talk to me, this or that. I have to explain to you tomorrow.

The jury also heard Marina tell her husband that Vasquez's lawyer also said "everybody is going to lose" if they go to trial.

Vasquez argues that the judge abused his discretion in allowing the government to recall Marina during its rebuttal case solely for the purpose of impeachment. He is correct that "a party may not call a witness for the

sole purpose of impeaching him." *United States v. Giles*, 246 F.3d 966, 974 (7th Cir. 2001). But Rule 611 gives the district court authority to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to . . . make the interrogation and presentation effective for the ascertainment of the truth." Fed R. Evid. 611. Furthermore, the judge has "broad discretion to determine whether the government's evidence [falls] within the proper scope of rebuttal." *United States v. Liefer*, 778 F.2d 1236, 1249 n.11 (7th Cir. 1985) (no error when court allowed government to recall two defense witnesses as government rebuttal witnesses).

Here, the government recalled Marina after it discovered the recorded conversations because it believed that they proved she was biased. Vasquez argues that the judge abused his discretion in allowing the government to recall Marina because it had an opportunity to cross-examine her previously. But there is no authority for the odd proposition that allowing a party to recall a witness based on new information is an abuse of discretion. The government sought to introduce evidence that one of Vasquez's main witnesses was biased. The judge did not abuse his discretion in allowing the government to recall Marina for this purpose.

Second, Vasquez argues that the MCC recordings were inadmissable hearsay. Extrinsic evidence of a witness' bias, however, is admissible to impeach that witness and is never a collateral issue. *United States v. Lindemann*, 85 F.3d 1232, 1243 (7th Cir. 1996). In the recordings, Marina says she talked with Vasquez's counsel several

times about the future of both Vasquez and her husband, and that she believed counsel could help her husband get a lower sentence. The government offered the recordings to prove that Marina had an incentive to lie—to get her husband a lower sentence. Moreover, when the government questioned Marina about the calls, her answer supported the government's theory:

Government:    And you thought that the defendant's attorney was recommending that your husband enter a plea where he did not admit the role of Alexander Vasquez, isn't that right?

Marina Perez:  Where [Perez] did not admit, yes, because [Vasquez] is going to trial.

Accordingly, Marina's testimony and the MCC recordings were admissible as extrinsic evidence to show Marina's bias and interest in trying to get her husband a lower sentence.

The recordings are also admissible as prior inconsistent statements. Vasquez argues that prior inconsistent statements must be "in fact inconsistent" under Federal Rule of Evidence 613. *United States v. Crovedi*, 467 F.2d 1032, 1037 (7th Cir. 1972). But "two statements need not be diametrically opposed to be inconsistent." *United States v. Jones*, 808 F.2d 561, 568 (7th Cir. 1986). Here, the government argued that Marina's statements to her husband—that he and Vasquez were in trouble and likely to be convicted—is arguably inconsistent with her story that it was her idea that Vasquez took the Bonneville on the day of the deal. While there may well be other ways

to look at this situation, we do not believe that the judge abused his discretion in permitting her to be questioned on the point.

The admission into evidence of the MCC recordings themselves, however, is a horse of a different color. The government argues that the judge did not err because it never sought to admit the recordings for their truth. But the government's argument ignores the fact that the judge said, without question, that "[w]ith respect to interest, bias, and prejudice . . . if any of these statements can be interpreted as such to indicate an interest, bias or prejudice, *they would go in for their truth*." (emphasis added). Vasquez is correct—on this point, the judge made the wrong call. But Vasquez gets no traction on this point if the error in admitting the MCC recordings for their truth was harmless. *See United States v. Olano*, 507 U.S. 725, 734 (1993). "The test for harmless error is whether, in the mind of the average juror, the prosecution's case would have been 'significantly less persuasive' had the improper evidence been excluded." *United States v. Emerson*, 501 F.3d 804, 813 (7th Cir. 2007). On appeal, the burden lies on the government to prove that a reasonable jury would have reached the same verdict without the challenged evidence. *United States v. Williams*, 493 F.3d 763, 766 (7th Cir. 2007).

Looking at the evidence as a whole, although the issue is close, we believe that the error was harmless. What was the evidence? We start with Vasquez's flight as possible evidence of guilt. While we agree with our dissenting colleague that flight evidence must be viewed

with caution, *United States v. Robinson*, 161 F.3d 463, 469 (7th Cir. 1998), we think it's important to note that there are degrees of flight. A defendant walking down a street who runs into a yard and then into a house after he hears an officer say, "Stop, police" is one thing. The flight here goes far beyond that. If there were degrees of flight, what happened here would be flight in the first degree. How else do you describe throwing the Bonneville into reverse, endangering officers (recall that Agent Chupik, with gun drawn, had to jump out of the way), hitting two police squad cars, and gunning it the wrong way into a roadway from the parking lot, ditching the car a few moments later and trying to escape by running through the kitchen and out the back door of a McDonald's?

Add to that, we have the cell phone logs showing several Perez\Vasquez contacts leading up to the aborted deal and Vasquez saying to Cruz "tell him we got the money here." And then there's the striking similarity between this caper and the one (also with Perez) that lead to Vasquez's drug conviction in 2002. The $23,000 in cash found in the hidden compartment of the Bonneville (recall $15,000 was hidden in the car during the 2002 deal) puts a little frosting on the cake. This evidence, we believe, would have moved the jury to convict Vasquez without a nudge from anything it heard in the government's rebuttal case.

For these reasons, the judgment of the district court is AFFIRMED.

HAMILTON, *Circuit Judge*, dissenting. I respectfully dissent. I agree with my colleagues that the district court did not abuse its discretion by allowing evidence of Vasquez's 2002 conviction, by allowing evidence found in the search of the automobile, or by limiting the cross-examination of Agent Chupik. I also agree that the district court's error in preventing the defendant from refreshing Agent Chupik's recollection was harmless. However, I cannot agree that the MCC tapes were admissible or that the district court's errors in admitting the MCC tapes were harmless. I would reverse the conviction and remand for a new trial.

Marina Perez's second visit to the witness stand in the government's rebuttal case, to explore a phantom inconsistency and to admit erroneously the MCC tapes, caused unfair prejudice to the defendant. The jury heard evidence that the defendant's lawyer had advised him to plead guilty and had said that if the three defendants went to trial, "everyone is going to lose." That evidence had no genuine probative value, and it is difficult to imagine more prejudicial evidence. Even if a limiting instruction telling the jury that such damaging evidence should not be considered for the truth of the matters asserted could have been effective, which I doubt, no instruction was given. The district court admitted the rebuttal evidence as proof of the truth of the matters asserted in the taped MCC telephone calls, which my colleagues and I all agree was an error.

The whole episode made for a fairly dramatic conclusion for the trial. The defense case concluded on a Thurs-

day, and the trial recessed for the weekend. On Sunday, the government filed an emergency motion for a continuance to prepare a rebuttal case using the MCC tapes of Marina Perez's conversations with her husband. On Monday, the court allowed the delay and sent the jury home. Mrs. Perez was called to testify again on Tuesday. In her testimony, she admitted the key legitimate point that the government was entitled to make: that she expected or at least hoped that Vasquez's lawyer could help her husband receive a lighter sentence. But the government's rebuttal did not stop there. After Mrs. Perez testified, the government played the tapes through another witness. On Wednesday, after further drama, the case was given to the jury.[1] Mrs. Perez's testimony and the government's attempted impeachment figured prominently in the government's closing argument to the jury. Then, after the jury had heard that Vasquez's attorney had told him to take a plea and that he was going to lose at trial, that same attorney rose, with his credibility destroyed, to give closing argument on Vasquez's behalf.

One theory for questioning Mrs. Perez about the MCC tapes and then admitting the tapes was that they were

---

[1] The further drama included the government threatening Vasquez's lawyer with investigation and prosecution, Tr. 571, and the court holding Joel Perez in contempt of court because he refused to testify and telling him that he faced life in prison if he continued to refuse. Tr. 578-79. After that finding and threat, the government said: "I don't know if we need Mr. Perez still or not." Tr. 579. He did not testify.

prior statements by Mrs. Perez that were inconsistent with her trial testimony for the defense. But inconsistent with what? Mrs. Perez testified that Vasquez drove to the site of the drug meeting because she asked him to pick up her husband with the Perez's car. Nothing in the MCC tapes is inconsistent with that testimony. The government's theory was that Mrs. Perez's belief that Vasquez would be convicted was inconsistent with her testimony that it was her fault that Vasquez happened upon the scene of the transaction. See Gov't Br. 18. The theory seems to be that if Mrs. Perez's trial testimony were honest, she necessarily would have believed that as long as she testified truthfully, the jury would unerringly find Vasquez not guilty. Because she was very worried that Vasquez would be convicted, goes the theory, the jury should conclude that she lied in her trial testimony.

That theory of the supposed inconsistency makes sense only if we assume that, if Mrs. Perez was telling the truth, she also must have had an extraordinary and even naive confidence in the infallibility of juries in telling the difference between true and false testimony. Any citizen who has followed recent news of exonerations of innocent but convicted defendants would be entitled to worry. One can be a great believer in the wisdom of juries, as I am, without assuming they are infallible. Let's assume for purposes of argument that Mrs. Perez's testimony about asking Vasquez to drive the Perez's car to pick up her husband was true. Even so, anyone as familiar as she was with the evidence against both her husband and Vasquez—who were then both in

the federal lock-up under federal indictment—could reasonably worry that she might not be believed. If a witness's expression of the view that a trial might come out the wrong way can be treated as inconsistent with the witness's testimony for the "right" result, we will see more cases with attempted impeachment like this.

I recognize that a prior statement need not be "diametrically opposed" with a witness's testimony to be inconsistent, but genuine inconsistency is still necessary. See *United States v. Hale*, 422 U.S. 171, 176 (1975); *United States v. Jones*, 808 F.2d 561, 568 (7th Cir. 1986); accord, *United States v. Cody*, 114 F.3d 772, 776-77 (8th Cir. 1997). The supposed inconsistency here was non-existent. It was an abuse of discretion to admit the evidence on that theory.[2]

The government's bias theory also does not justify admission of the MCC tapes. Evidence of a witness's bias is always relevant, of course. See, *e.g., United States v. Lindemann*, 85 F.3d 1232, 1243 (7th Cir. 1996). But the first problem here is that before the MCC tapes were

---

[2] My colleagues also suggest that Mrs. Perez failed to disclose several meetings with Vasquez's lawyer when she testified in the defense case. Slip op. at 12-13. She testified about the only meeting she was asked about. Tr. 419. The fact that she had other meetings, which she was not asked about, was not inconsistent with her testimony. A witness should not be impeached for having failed to volunteer information not sought by the questioner. In fact, in a criminal trial, volunteered information often poses a greater danger to the fairness of the trial than omissions do.

admitted, Mrs. Perez had already admitted the asserted bias: she hoped that Vasquez's lawyer would help her husband receive a lower sentence. There was no need for further extrinsic evidence of the point, especially where that extrinsic evidence posed all the problems that the MCC tapes did here. In light of Mrs. Perez's candid (if perhaps naive) admission, the tapes provided no or little additional probative value, but caused substantial unfair prejudice to defendant Vasquez.

Neither theory of admission—prior inconsistent statements or evidence of bias—supported admission of the MCC tapes at all. My colleagues and I agree at least, however, that the district court erred in admitting the MCC tapes for the truth of the matters asserted by the speakers. Bias is not an exception to the hearsay rule, and even genuinely inconsistent statements are not admissible for the truth of the matters asserted. In this case, the tapes included hearsay, double hearsay, and even triple hearsay. In the most extraordinary and prejudicial example, the jury heard Joel Perez tell Marina Perez that Vasquez had told him that Vasquez's lawyer had told Vasquez that he should plead guilty:

> Marina:      So what'd Beau [Vasquez's lawyer] tell him [Vasquez]? What did Beau tell him?
>
> Joel:        A blind plea would be good, then he can guarantee this and that. You know what I mean? Just certain things, you know? I got to explain to you.
>
> Marina:      He's telling him about a blind plea also?

Joel: Yeah, he is. I gotta explain to you. You know what I mean. He says, if you want, have his wife talk to me, this or that. I have to explain to you tomorrow.

Supp. App. 13.[3] The jury also heard Marina Perez tell her husband that Vasquez's lawyer (who was his lead trial attorney) had told her that if the three defendants went to trial, "everybody is going to lose." Supp. App. 11. The government highlighted that comment in its questioning of Mrs. Perez. Tr. 528-29. The erroneous admission of this highly prejudicial hearsay and triple hearsay for the truth of the matters asserted should require a new trial.

My colleagues conclude, however, that the erroneous treatment of the MCC tapes evidence was harmless because the government had so much other evidence against Vasquez. I respectfully disagree. The issue is whether the reviewing court is "convinced that the jury would have convicted even absent the error." *United States v. Simmons*, 599 F.3d 777, 780 (7th Cir. 2010) (holding

---

[3] The government argues for a different interpretation, that Joel Perez was telling Marina that Vasquez's lawyer had told Joel that Joel should enter a blind guilty plea (*i.e.*, a plea without an agreement). In context, the better reading, and certainly a permissible interpretation available to the jury, is that both Joel's lawyer and Vasquez's lawyer were telling their respective clients that they should enter blind guilty pleas. That explains Marina's "also," since Joel's lawyer was advising him at the time to enter a blind plea.

that arguable errors in admitting evidence were harmless in light of defendant's own admissions about his involvement in crime). The standard calls upon an appellate court not to "become in effect a second jury," see *Neder v. United States*, 527 U.S. 1, 19 (1999), but to determine "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Id.* at 15, quoting *Chapman v. California*, 386 U.S. 18, 24 (1967). Accord, *e.g.*, *United States v. McGowan*, 590 F.3d 446, 456 n.1 (7th Cir. 2009); *United States v. Williams*, 493 F.3d 763, 766 (7th Cir. 2007).

The standard is not easy to satisfy, and four factors here lead me to conclude this error was not harmless: the modest strength of the rest of the government's case against Vasquez, the prejudicial character of the evidence that was admitted erroneously, the fact that the jury acquitted Vasquez of one of two charges, and the importance that the government itself attributed to its flawed rebuttal evidence.

Looking first at the strength of the rest of the case, we can all agree that the government had a solid case against both Perez and Cruz. Both were recorded making arrangements for the cocaine purchase, and both showed up at the agreed time and place. The case against Vasquez was not as clear. Vasquez was not recorded at all. He was not even mentioned in any of the recorded calls. The agents, the confidential informant, and even Cruz were expecting only a single customer to show up for the meeting. They knew nothing about Vasquez until they saw him arrive in the Perez's car at

the nearby Denny's parking lot, from where he could see Perez and Cruz. He never got out of the car, and the agents did not hear him talk with anyone.

On the other hand, of course, Vasquez arrived at the scene of a planned drug meeting driving a car carrying $23,000 in a hidden compartment. He fled in the car, dramatically and dangerously, as the agents tried to make the arrests. He had previously been convicted of a drug deal with Perez using a car with a similar hidden compartment. And Cruz testified that he heard Vasquez tell Perez on the telephone: "tell him we got the money here."

Let's put aside the flight evidence for a moment and focus on the other evidence. Marina Perez's testimony provided an innocent explanation for Vasquez's presence on the scene in the car with the hidden money. She said she planned to pick up her husband but had an argument with him. She asked Vasquez to pick him up and to take the Perez's car because his own was parked in by that car. The credibility of her testimony is at least debatable. And Cruz, the co-defendant who set up the meeting with the informant, testified that Perez was not even supposed to bring any money to the meeting, Tr. 237-38, which is at least consistent with her testimony.

Cruz's testimony about Vasquez's statement, "tell him we got the money here," was important. Apart from the flight evidence, it was the strongest evidence against Vasquez, and it was actually inconsistent with Marina Perez's testimony. My colleagues treat the statement as an undisputed fact, but that is a mistake when we

are evaluating whether an error was harmless. The credibility of that key bit of testimony was subject to strong attacks, far stronger than the government's attacks on Mrs. Perez's testimony. Cruz was a cooperating defendant with powerful incentives to help the government prove its case against Vasquez, the only one of the three who went to trial. On the witness stand, Cruz admitted having lied to the government about Vasquez and several other subjects. Tr. 250-52, 254-56, 268-72, 289. Most important, Cruz admitted that he first told the government about Vasquez's supposed "money" comment less than one week before trial. Tr. 263-64. By that time, Cruz had already been debriefed by the government several times, all without ever mentioning the single most damaging part of his testimony against Vasquez. On this record, the jury could easily have treated the "money" comment as a late and false invention by Cruz. The Rule 404(b) evidence—the prior conviction—was strong evidence, but it remained 404(b) evidence that could not make the case by itself.

Without the flight evidence and the MCC tapes erroneously admitted for their truth, then, the government had evidence that was legally sufficient to convict Vasquez, but the case was far from a slam-dunk. The dramatic evidence of the dangerous flight strengthened the case substantially and makes it easier for my colleagues to describe the district court's error as harmless. But the flight evidence cannot carry that much weight, in my view. The Supreme Court and we have repeatedly cautioned against too much reliance on flight

as evidence of guilt for the crime charged because there are so many links in the chain of inferences:

> We have long adhered to the Supreme Court's cautionary language urging courts to be wary of the probative value of flight evidence. See *Wong Sun v. United States*, 371 U.S. 471, 483 n.10 (1963) ("[W]e have consistently doubted the probative value in criminal trials of evidence that the accused fled the scene of an actual or supposed crime."). While we allow evidence of flight to be presented, courts must engage in careful deliberation when considering its admission. Determination of the probative value of flight as evidence of a defendant's guilt depends on the degree of confidence with which four inferences can be drawn: (1) from behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged. See *United States v. Levine*, 5 F.3d 1100, 1107 (7th Cir. 1993); see also *United States v. Jackson*, 572 F.2d 636, 639 (7th Cir. 1978) (adopting this analysis as set forth in *United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir. 1977)).

*United States v. Robinson*, 161 F.3d 463, 469 (7th Cir. 1998). If we follow that cautious approach to flight evidence, we should not rely on it to save the jury's verdict from the error we all agree was made in admitting the highly prejudicial evidence from the MCC tapes.

We must also consider the prejudicial effect of the improper evidence. The evidence from the MCC tapes, admitted here erroneously for their truth and with no true probative value, was just about as prejudicial as one could expect to encounter in a trial. The jury heard that Vasquez's lawyer—the man who would soon make a closing argument asking them to find reasonable doubt in the government's case—had told Vasquez that he should plead guilty and had said that if he and his co-defendants went to trial, "everyone is going to lose." A juror who heard and believed that evidence would surely discount anything she heard from that lawyer. In terms of prejudice, these harpoons are comparable to evidence of a defendant's own withdrawn guilty plea. Such a plea is virtually never admissible because of its powerful force. See Fed. R. Evid. 410(1); *Kercheval v. United States*, 274 U.S. 220, 223-24 (1927).

We also have strong indications from both the jury and the government itself that the erroneous admission of the MCC tapes was not harmless. Even with the prejudicial and erroneous evidence, the jury still found Vasquez *not* guilty on the charge of attempted possession with intent to distribute. That verdict is hard to reconcile with the jury's conviction on the conspiracy charge, and the split verdict certainly has the whiff of a compromise verdict in a close case. Such verdicts are permissible in criminal cases, of course, but when determining whether, beyond a reasonable doubt, a conceded error was harmless, we should not ignore that strong signal that the jury viewed the case as a close one, even

with the evidence of flight and the improper rebuttal evidence.

The government also showed how important it believed the improper rebuttal evidence was by its extraordinary efforts to obtain its admission. The trial seemed nearly over when the government filed its emergency Sunday motion for a continuance to enable it to prepare this rebuttal case. The events of the next several days, including especially the government's emphasis on the improper evidence in its closing argument, showed that the government believed that Mrs. Perez had seriously weakened its case and that the improper rebuttal evidence strengthened its case considerably. My colleagues disagree with that assessment, but in applying the harmless error standard, we should give more weight to the views of the party who sought admission of the improper evidence, as shown by that party's conduct at trial.

I am not trying to suggest that Vasquez is actually innocent or that I necessarily believe Marina Perez's testimony about why he was in the car at the scene of the bust. Those are questions for the jury. But in light of the closeness of the case, the highly prejudicial nature of the improper evidence, the jury's split verdict, and the government's emphasis on the improper evidence, I am not convinced beyond a reasonable doubt that the jury would have convicted Vasquez in the absence of the improper and highly prejudicial MCC tape evidence. I would vacate the judgment and order a new trial.